UNITED STATES of America, Appellee,

v.

Jack BLACK, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Herbert E. PLYMPTON, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Jeffrey Harris LAVIGNE, Defendant,
Appellant.

Nos. 94–1852, 95–1149 and 95–1187.

United States Court of Appeals,
First Circuit.

Heard Jan. 16, 1996.

Decided Feb. 27, 1996.

David A. Schechter, Margaret–Mary Hovarth and Law Offices of David A. Schechter, Providence, RI, on brief, for appellant Jack Black.

Charles J. Rogers, Jr., Providence, RI, on brief, for appellant Herbert E. Plympton.

Paul A. Dinsmore, Rumford, RI, on brief, for appellant Jeffrey Harris Lavigne.

Jeffrey Harris Lavigne, pro se.

Gerard B. Sullivan, Assistant United States Attorney, Sheldon Whitehouse, United States Attorney, and Margaret E. Curran, Assistant United States Attorney, Providence, RI, on briefs, for the United States.

Before BOUDIN, Circuit Judge, COFFIN, Senior Circuit Judge, and ROSENN,* Senior Circuit Judge.

* Of the Third Circuit, sitting by designation.

BOUDIN, Circuit Judge.

Appellants Jack Black, Herbert Plympton and Jeffrey Lavigne were indicted in November 1993 and charged with conspiracy to steal and sell goods in interstate commerce, 18 U.S.C. § 371, and with various substantive crimes incident to the conspiracy. Also named in the indictment as co-defendants were the alleged ring-leader, Donald St. Germain, and two others: Raymond Wilbur and Joni Lynn Smith, who was Plympton's wife. All of the indicted defendants, except for Lavigne and Plympton, later pled guilty to specific offenses. Several other co-conspirators pled guilty to informations.

Plympton and Lavigne were convicted in separate jury trials. At trial, the government sought to show that St. Germain organized a series of thefts of truck trailers and merchandise in 1991 and 1992. Typically, the thieves used a borrowed or stolen truck tractor to haul away an unattended trailer. After checking the contents, they moved the trailer to various locations in Rhode Island and thereafter disposed of the merchandise. One storage location was at the American Waste Paper Company in Cranston, Rhode Island; later, several shipments were stored at the Plympton farm in Exeter, Rhode Island.

In Plympton's case, the government dismissed the conspiracy count against him and tried him on three substantive counts relating to two of the many thefts attributed to St. Germain. Counts 1 and 2 of the redacted Plympton indictment charged him with receiving, concealing and disposing of a shipment of stolen Lands' End merchandise moving in interstate commerce in the fall of 1992 and of knowingly possessing stolen goods comprising part of the same shipment. 18 U.S.C. §§ 2315, 659. Count 3, based solely on section 2315, involved a shipment of Pennsylvania House furniture, stolen a month or so later and allegedly also stored at the Plympton farm.

Lavigne, St. Germain's companion or bodyguard, was indicted only on a single count. He was charged under 18 U.S.C. § 1512(b)(3) with threatening physical harm in order to

delay or prevent one Kathleen Hartman from providing information to a law enforcement officer concerning commission of a federal offense. Hartman was the office manager of American Waste Paper Company and had provided information to state and federal agents. The government charged Lavigne with twice intimidating Hartman in the spring of 1991.

Black, who had pled guilty to conspiracy and to one substantive count under section 2315, was sentenced to 60 months' imprisonment; Plympton to 41 months; and Lavigne to 46 months. Substantial restitution payments were ordered for Black and Plympton, and Lavigne was fined $1,000. On appeal, Plympton and Lavigne challenge their convictions, and Black and Plympton appeal from their sentences.

*Plympton.* On this appeal, Plympton does not dispute the sufficiency of the evidence on counts 1 and 2 but argues that they comprised only a single offense, making the indictment multiplicitous and violating the bar against double jeopardy. More precisely, Plympton argues that the section 659 offense is effectively a lesser included offense within section 2315. If it were, Plympton could not be convicted and sentenced for both offenses based on the same theft. *United States v. Parrilla–Tirado,* 22 F.3d 368, 372 (1st Cir. 1994).

■ Under the familiar test of *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), the two statutes do not punish the same offense, nor is one included within the other, where "each provision requires proof of an additional fact which the other does not." To prove a violation of section 659, the government had to show that Plympton stole or concealed property "moving as or . . . part of or . . . constitut[ing] an interstate . . . shipment"; here, for example, the Lands' End shipment when stolen had been moving in interstate commerce.

Section 2315, by contrast, does not require proof that the theft was from interstate commerce; but it does require a different interstate-commerce element not required by section 659. Section 2315 punishes receiving or disposing of goods known to be stolen where

such goods "have crossed a State . . . boundary after being stolen." In this case, the Lands' End shipment, after being stolen in Pennsylvania, was moved to Plympton's farm in Rhode Island.

The central focus of each statute is somewhat different, one being concerned primarily with theft and concealment and the other with the receipt and disposition of stolen property. Plympton's activity, in the middle of the chain, brought him within the language of both. And the difference in the interstate commerce elements meets the mechanical *Blockburger* test. The test has been criticized, but it was properly applied in the district court, happens to do no injustice here (one trial; no increase in punishment), and is binding upon us.

No *Blockburger* problem is presented by count 3. It concerned a different theft—that of Pennsylvania House furniture—on a different occasion; and in this instance the charge was based only upon section 2315. But on this count Plympton does challenge the sufficiency of the evidence, arguing that the government failed to prove that the Pennsylvania House furniture was ever at his farm or, if it was, that Plympton knew about it.

■ Taking the evidence in the light most favorable to the government, *United States v. Robles,* 45 F.3d 1, 2 (1st Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 1416, 131 L.Ed.2d 300 (1995), the jury could reasonably conclude that Plympton used his farm to conceal stolen shipments for St. Germain; some of the stolen Lands' End merchandise was found on the farm and there was ample evidence that Plympton knew it was stolen. There was also evidence that Plympton had earlier concealed a stolen shipment of K–Mart merchandise on the farm. Against this background, the evidence to connect Plympton to the Pennsylvania State furniture shipment was sufficient even if not overwhelming.

Although none of the furniture was found at the farm, there was unequivocal testimony from one witness—Frank Macera—that Plympton received the furniture shipment and knew it to be stolen. Macera, who had

pled guilty to a criminal information covering the same transaction, was not a very trustworthy witness. But the jury was entitled to accept his testimony, which was plausible enough, especially because technical and eyewitness evidence added small but useful elements of corroboration.

■ Finally, Plympton contests his sentence in several respects. First, in calculating the offense level, the district court imposed a two-level increase for obstruction of justice; specifically, the court found that Plympton had lied at trial when he denied knowing that the Lands' End merchandise in his barn was stolen and knowing anything about the Pennsylvania House furniture. No one disputes that the increase was required if Plympton did in fact commit perjury at trial. U.S.S.G. § 3C1.1; *United States v. Hernandez Coplin*, 24 F.3d 312, 317 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 378, 130 L.Ed.2d 328 (1994).

Plympton says that the evidence was insufficient to show that he knew that either load of furniture was stolen. But we have already said that there was enough to convict as to the Pennsylvania House furniture theft and the evidence against him as to the Lands' End theft was even stronger. If it was enough to convict, it was more than ample for a sentencing determination under the preponderance of the evidence standard. *United States v. Lombard*, 72 F.3d 170, 176 (1st Cir.1995). The claim of inadequate evidence is too weak to warrant further discussion.

After calculating the offense level, the trial judge departed upward by two additional levels. The grounds for this departure were that after conviction but before sentence Plympton created an irrevocable trust for his six year old daughter and transferred to it, without consideration, his real estate and business assets. The trial judge found after a hearing at which Plympton testified that the purpose of the transfer was to frustrate collection of a likely fine or restitution and that Plympton himself regarded the trust as "a sham."

Plympton now attacks the district court's finding, arguing (as he testified) that his purpose was simply to provide for his daughter during his imprisonment and in the event of divorce. But the evidence also showed that Plympton created the trust shortly after his wife had been ordered to pay over $400,000 in restitution; that Plympton had been warned by his lawyer that the trust might be viewed as an attempt to avoid payment of restitution or fines; and that Plympton intended to return to operate his business after release and expected to be able to use the real estate as well.

■ Fact-findings by the district court in sentencing, including departures, are based on the preponderance standard and subject to reversal only if clearly erroneous. *United States v. Porter*, 924 F.2d 395, 399 (1st Cir.1991). The court's findings as to Plympton's aim and attitude are permissible inferences by a fact-finder who heard Plympton testify. They are not inconsistent with the further finding that Plympton *also* sought through the trust to provide for his daughter and manage his business while in prison. The end was proper but the means were not.

■ Although Plympton does not argue the issue in these terms, we have also considered whether the district court accepted, and the evidence supports, the government's claim that Plympton acted in bad faith. Without this additional element, we might have serious concerns. But the district court's language ("sham," "fraud") makes clear that it did find bad faith and, again, the inference is permissible under the clearly erroneous standard. Our concerns, therefore, are for another occasion.

The most interesting issue is one that Plympton does not raise, namely, whether the attempt to frustrate a fine or restitution order is a permissible basis for a departure. While Plympton did not preserve the issue nor argue it on appeal, we would at least be faced with a plain error issue if we thought that the departure were not authorized. There is no need to discuss the extent of deference that may be due to the district court, *see United States v. Rivera*, 994 F.2d 942 (1st Cir.1993), since we agree that its implicit interpretation of the guidelines was correct.

■ A defendant's attempt to frustrate the actual or anticipated judgment by secreting assets is closely akin to obstruction of justice; indeed, if Plympton had sought to hide himself before sentencing in order to avoid prison, he would plainly be covered by the obstruction guideline and subject to an automatic two-level enhancement on that account. U.S.S.G. § 3C1.1, Comment. (n. 3(e)). One could argue that the secreting of assets was covered by the same guideline but, if not, then by analogy Plympton's conduct properly qualified for a departure under the catchall departure provision. U.S.S.G. § 5K2.0.

■ Plympton might protest that, since he has already been given a two-level adjustment for obstruction by perjury, it is double counting to give him an additional two levels through the departure mechanism. Of course, the latter increase results from a different act of obstruction; but Plympton might respond that the guidelines contemplate only one two-level increase, no matter how many acts of obstruction occur and regardless of whether the second act is considered under section 3C1.1 or 5K2.0.

Here, Plympton's attempt to frustrate restitution was not just additional perjury but a new and different act of misbehavior with a different victim; and the sum of the two is greater than either standing alone. Even if both are treated as forms of obstruction and are within section 3C1.1—a matter we need not decide—section 5K2.0 permits departure for an aggravating circumstance "of a kind, *or to a degree,* not adequately" considered by the guidelines. The district court could fairly conclude that this case fell outside the "heartland" and warranted a departure. *Accord United States v. Merritt,* 988 F.2d 1298, 1310–11 (2d Cir.), *cert. denied,* 508 U.S. 961, 113 S.Ct. 2933, 124 L.Ed.2d 683 (1993).

Plympton's last sentencing claim is that the district court acted improperly in requiring him to make restitution either at all or within 60 days. None of the arguments under this head were presented in the district court. We have examined them all and conclude that none of the arguments now offered even arguably points to plain error.

*Lavigne.* Lavigne, like Plympton, urges that the evidence was not sufficient to permit a jury to convict him. The single violation charged in his case was of 18 U.S.C. § 1512(b)(3) which in pertinent part punishes anyone who "knowingly uses intimidation of physical force, [or] threatens . . . or attempts to do so . . . with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense. . . ."

The evidence against Lavigne, taken in the light most favorable to the government, *Robles,* 45 F.3d at 2, permitted the jury to find the following. Kathleen Hartman was the officer manager of American Waste Paper and had a romantic connection to its owner, Frank Luchka. The company was in bankruptcy and St. Germain persuaded Luchka to allow the company's premises to be used to store the stolen trailers. Hartman was aware of these arrangements and assisted with record-keeping and other tasks concerning the stolen property.

In February 1991, Hartman secretly contacted the Rhode Island State Police and reported that the site was being used for stolen property. On April 3, 1991, the company's premises were raided by the FBI, the state police, and local police, and a number of stolen trailers were recovered. Hartman continued to cooperate confidentially with state and later with federal agents. The conduct for which Lavigne was indicted comprised two episodes.

■ First, on the day of the raid, Luchka and Hartman were present during the search; that evening they met at a nearby bar and were joined by St. Germain and Lavigne. With Lavigne barring Hartman's exit from the bar booth, St Germain told Hartman that he would have her silenced if she spoke to law enforcement agents. As Hartman went downstairs to the restrooms, she met Lavigne who was returning up the stairs. Lavigne stopped and, apparently without saying anything, lifted his pant leg to reveal a gun in an ankle holster.

Second, a week or so later, Hartman and Luchka were at another bar and again en-

countered St. Germain and Lavigne. St. Germain and Luchka went outside where St. Germain told Luchka that he thought that Hartman had "blown the whistle" on the scheme. When they returned, St. Germain asked Hartman if she had spoken with anyone and, with an oblique reference, indicated that she would come to harm if she did. During this warning, Lavigne, who was standing between them with his foot resting on a bar stool, lifted his pants leg to reveal a leather holster on his ankle.

From this evidence alone, the jury was entitled to infer that Lavigne was deliberately threatening Hartman with violence if she cooperated with law enforcement authorities. Lavigne's pantomime was patently a threat of violence, and nothing in the statute requires that the threat be verbal. *United States v. Balzano,* 916 F.2d 1273, 1291 (7th Cir.1990). On appeal, Lavigne offers a more antiseptic version of what happened, but we have reviewed the transcript and conclude that the jury was entitled to find the facts as we have recited them.

Lavigne raises a series of objections based on alleged misconduct by the prosecution and on the alleged incompetence of his trial counsel. The misconduct claim is based on the introduction of testimony by two FBI agents that Lavigne had admitted intimidating Hartman; this statement was made during a polygraph examination and, it is argued, therefore should not have been used by the prosecution. The ineffective assistance claim rests on trial counsel's failure to elicit two prior state felonies which were subsequently elicited by the prosecution; the failure of counsel to call two witnesses who allegedly would have exonerated Lavigne; and counsel's failure to object to the introduction of Lavigne's statement during the polygraph examination.

As to the statements made during the polygraph examination, there was no error here, let alone plain error. Although the results of polygraph examinations are generally inadmissible, *see United States v. Scarborough,* 43 F.3d 1021, 1026 (6th Cir.1994), it was not the *results* of the examination that were introduced, but only Lavigne's own admissions to the examiners. Lavigne had

signed a waiver of his right against self-incrimination, and he offers no reason why the fact that the statements were made during a voluntary polygraph examination should affect their admissibility. Lavigne's claim of prosecutorial misconduct is thus without merit.

Absent unusual circumstances, we do not review claims of ineffective assistance that have not been raised before the trial court. *United States v. Mala,* 7 F.3d 1058, 1063 (1st Cir.1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 1839, 128 L.Ed.2d 466 (1994). Each of Lavigne's claims involves questions of trial tactics and resulting prejudice and requires inquiry into underlying facts. We do not think that "the record is sufficiently developed to allow reasoned consideration of the claim," *id.,* and therefore decline to reach Lavigne's ineffective assistance of counsel claim.

*Black.* Black was arrested in the course of delivering a portion of a stolen load of Pennsylvania House furniture from Plympton's farm to a flea market in Revere, Massachusetts. He later pled guilty to two counts, one charging him with participation in the overall conspiracy and the other relating to the Revere delivery. 18 U.S.C. §§ 371, 2314. In exchange, the government agreed among other things to recommend a sentence at the low end of the applicable guideline range and to file a downward departure motion if Black provided substantial assistance.

The presentence report computed Black's adjusted offense level as 14, based on the value of the goods attributed to Black and on other adjustments (upward for more than minimal planning and downward for acceptance of responsibility). U.S.S.G. §§ 2B1.1, 3E1.1. The presentence report also computed Black's criminal history points as 21, placing him in category VI, the highest category. These calculations, which were accepted by the district court, established a range of 37 to 46 months' imprisonment.

At the outset of the sentencing hearing, the district court expressed concern that the resulting range did not adequately reflect Black's full criminal history. After letting defense counsel argue against an upward

departure, the district court pointed out that at age 32, Black had already accumulated 21 criminal history points, 8 more than were needed to place him in category VI. The court then reviewed Black's criminal history in detail, describing a succession of offenses and penalties starting at age 18, Black's juvenile file being sealed:

> At age 18 assault, disorderly conduct, malicious damage, larceny, assault and battery. At 19 larceny. Age 20 assault and battery. Age 20 larceny over $500. This is breaking into an automobile and stealing a battery and some plumbing tools which the Defendant got apparently a year custody and that counts for one point. Age 20, disorderly conduct. Age 20, possession of controlled substance which is diazotan. He got two years suspended. He's a violator on a preexisting suspended sentence. He gets two years to serve. That counts for three points. Age 20, shoplifting. Age 20, conspiracy to commit larceny, larceny over $500. That counts for one point. That's a one year suspended sentence, three years probation. Age 20, possession of a stolen motor vehicle. Counts for three points. One year custody. This is a 1979 Ford econoline van which had been stolen which the Defendant was driving. Age 20, possession of marijuana, one point, 30 days custody. Age 20, possession of stolen motor vehicle which a number of other charges, possession of needle and syringe. Three years custody. Three points. Age 21, armed robbery. This is a Dairy Mart held up at gun point in Warwick. He got 30 years, 11 to serve and 19 suspended. It counts for three points. Apparently there's a violation there on that. Since January 27 of 1994, age 29, passing counterfeit certificates. That's a counterfeit $20 bill. He got five years, six months to serve. That counts for two. The armed robbery counts for three. Age 29, disorderly conduct, resisting arrest. Age 30, simple assault. Counts for one plus two points because the Defendant committed this offense while he was on probation, and one point because he was released from prison less than two years prior to the instant offense. All this in 32 years.

The district court then formally concluded that Black's criminal history category did not adequately represent his actual criminal history and departed upward from level 14 to level 17. This increased the guideline range to 51 to 63 months. The government recommended a sentence at the low end of the range, as it had promised but declined to move for a departure under U.S.S.G. § 5K1.1 because Black's assistance had not proved useful. The district court then sentenced Black to 60 months' imprisonment, explaining its reasons for this choice.

■ On appeal, Black's only challenge is to the district court's decision to depart upward. The "law" is simply stated. The guidelines permit such a departure where the court believes that the criminal history category does not "adequately reflect the seriousness of the defendant's past criminal conduct," U.S.S.G. § 4A1.3, and this includes "on occasion" a departure even for a category VI defendant with an "egregious, serious criminal record [for whom] even the guideline range for Criminal History Category VI is not adequate." *Id.*

■ Putting aside a procedural objection that we think is without merit, Black makes two different arguments against the departure decision: the first is a claim that no departure was justified on the present facts. Since the type of departure involved is expressly permitted by the guidelines, the question whether one was justified by the circumstances here turns on questions of fact, reviewed only for clear error, and of law application, reviewed deferentially under "a standard of reasonableness." *United States v. Diaz–Villafane*, 874 F.2d 43, 49 (1st Cir.), *cert. denied*, 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989).

The facts are essentially undisputed—no one claims that the court misdescribed Black's criminal history—so the issue is one of reasonable judgment in applying the departure criteria to particular facts. Black says that the district court acted mechanically, imposing the departure basically because Black had far more points than the minimum for category VI. This is not a complete description of what happened: the district

judge mentioned the point differential but followed this with a lengthy recitation of Black's actual criminal history, which we have already quoted.

What this record showed was that in a 14–year criminal career starting at age 18, Black had been almost constantly in trouble except for one period spent in prison; that his offenses involved drugs, theft, repeated physical violence, and on one occasion firearms; that despite considerable leniency in punishment at early stages, he regularly resumed his criminal career; that even a substantial sentence for armed robbery did not dissuade him from resuming this career of crime upon his release; and that he had committed crimes while on suspended sentence and probation.

It is plain that the district court thought that Black had devoted himself to a career of crime which, given his still young age, was far from over. It followed that a sentence of three to four years—as provided by the guidelines—was not very substantial protection to the community, nor likely to deter a defendant who had effectively shrugged off an eleven year sentence for armed robbery. Indeed, the government reports that, when arrested, Black allegedly told the state police detective that he "could do the time on his head."

The implicit concerns of the district court are ones deemed pertinent by the cases which advert to the "frequency and repetitiveness of the felonious behavior," *United States v. Ocasio*, 914 F.2d 330, 335 (1st Cir. 1990), and the risk of recidivism, *United States v. Emery*, 991 F.2d 907, 913 (1st Cir. 1993). It is hard to quantify these concerns but, on this issue, we think that the district court was entitled to take note of the fact that Black had over 150 percent of the points needed for category VI. We agree with Black that in some cases departures have been based on worse records but do not think that the district court's decision to depart here was unreasonable.

It would have been 'helpful if these inferences had been spelled out by the district judge. *Ocasio*, 914 F.2d at 335 & n. 3. But we think they are obvious in the district court's recitation of Black's criminal history and certain other remarks made by the judge at sentencing. Upward departures are serious business; and, although mindful of the time pressures on the district courts, we urge again that some expression of reasoning, as well as fact-finding, accompany a departure. *E.g.*, *Emery*, 991 F.2d at 913. But we will not remand for an explanation that is so clearly implicit in what the district court found.

Black's second argument is that the degree of departure was unreasonable or at least inadequately explained. The increase from level 14 to level 17, given Black's criminal history category, amounted to an increase in the sentencing range which can be measured in several ways: as a percentage, it is an increase of minimums and maximums of about one-third, which sounds substantial; but in terms of months, it increases the ultimate range, measured by the midpoint of each range, by about 15 months—something less than overwhelming.

The latter figure alone suggests that, by a standard of reasonableness, the degree of the departure was not disproportionate, given Black's record and the implicit rationale of the district court for making any departure. Even looked at in percentage terms, a 30 percent departure is not out of line with past precedent, using criminal history points as a crude way of comparing like with like. *Cf. Emery*, 991 F.2d at 914 (upholding 41 percent, 21–month departure for offender with 20 criminal history points); *Brown*, 899 F.2d at 96 (upholding 133 percent, 12–month departure for offender with 20 criminal history points).

But Black mainly attacks the degree of the departure on the ground that the district court did not *explain* its choice of three levels rather than some other figure. It is true that the court gave no explicit explanation directed at the choice of a particular figure. But at least where a small departure is involved, it may be difficult to provide any explanation *over and above* that given for the decision to depart. Thus, we have held that "a reasoned justification for [the] decision to depart"—readily inferred in

this case—may also constitute "an adequate summary from which an appellate tribunal can gauge the reasonableness of the departure's extent." *Emery*, 991 F.2d at 336–37.

In this case the departure, measured by months, was quite modest and Black's only practical concern is with why he did not receive even less. It is hard to know how the district court could have explained *this* choice—to depart by three levels instead of one or two—except to say that the grounds for departure called for more than a slap on the wrist. Given the modesty of the departure and its alignment with prior cases, such as *Emery* and *Brown,* we do not think that the lack of an explanation can be deemed prejudicial or casts any doubt on the facial reasonableness of the departure.

*Affirmed.*