# United States Court of Appeals
## For the First Circuit

---

Nos. 00-1675
     00-1676

UNITED STATES,

Appellee,

v.

SCOTT R. CHAPMAN,

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

---

Before

Torruella, Chief Judge,
Cyr, Senior Circuit Judge,
and Stahl, Circuit Judge.

---

Neal K. Stillman for appellant.
Margaret D. McGaughey, Assistant United States Attorney, with whom Jay P. McCloskey, United States Attorney, was on brief, for appellee.

---

February 27, 2001

---

**STAHL, Circuit Judge**. These consolidated appeals result from two sentences imposed upon Scott R. Chapman by the United States District Court for the District of Maine (Carter, J.). On appeal, Chapman raises three issues. First, he argues that it was error to impose his sentences consecutively rather than concurrently. Second, he disputes the two-level enhancement to his offense level for more than minimal planning. Finally, he contends that the imposition of a five-month upward departure from the sentencing guideline range, levied on the basis of his excessive criminal history, was unreasonable. Finding no error in any of these decisions, we affirm.

## I. BACKGROUND

At the time of the events relevant to this appeal, Chapman, a career criminal, was on supervised release following his most recent incarceration. Among the conditions to which he was subject were: 1) that he not leave the judicial district without permission; 2) that he not commit another federal, state, or local crime; and 3) that he abstain from all drug and alcohol use and participate in a drug and alcohol therapy program.[1] Chapman violated all three of these conditions within his first few months of freedom.

---

[1] These numbers differ from the original numbering of the conditions, as they reflect only those conditions relevant here.

On June 9, 1999, as a result of an error on the part of the Bureau of Prisons which kept Chapman incarcerated 104 days longer than required, he was released from prison suddenly and without notice.[2] Using the $69 given to him as "gate money" upon release, he purchased a bus ticket that eventually brought him to Portland, Maine. After arriving there without funds and with no place to live, Chapman fortuitously found employment and housing with John Jollatta, a contractor who gave him work and allowed him to live at his home.

Shortly after he began work, Chapman, on two separate occasions, suffered work-related injuries. After his second injury Chapman was hospitalized. Jollatta visited him at the hospital and asked him not to file a worker's compensation claim, offering instead to cover his medical expenses in exchange. Chapman agreed and, after he was released from the hospital, moved back in with Jollatta. Thereafter, when Jollatta did not immediately pay the medical bills, Chapman became angry and departed Jollatta's employment and home, taking with him the company's business checkbook.

---

[2] This extra time served, however, is not relevant to the determination of his sentences in this case. The Bureau of Prisons will automatically deduct it from the time he now must serve for revocation of his supervised release.

Chapman had a savings account at People's Heritage Bank, which he had opened when he first became employed. This was also Jollatta's bank. On August 2 and 3, 1999, Chapman engaged in a check kiting scheme using the checks he had stolen from Jollatta by writing several checks to himself for varying amounts, and then depositing them to his account. Subsequently, during the two-day period and at four different branches of the bank, he either cashed the checks and/or made withdrawals from the amounts previously deposited into his account at the bank. He also wrote one check to a retail store. In this way, over the two-day period, Chapman defrauded People's Heritage of $11,405.96 before it discovered the scheme.

Chapman was arrested on August 26, 1999, in Montpelier, Vermont. He attempted to escape from the arresting officers, but was caught. Subsequently, during a search of his residence, cocaine and illegal mushrooms were found. On January 18, 2000, Chapman pled guilty to violating the terms of his supervised release by committing a new federal crime and was sentenced to serve an additional 24 months as a result. Chapman does not appeal this sentence.

On the same day, Chapman also pled guilty to a charge of bank fraud. The base offense level for this crime was 6. Three levels were added pursuant to U.S.S.G. § 2F1.1(b)(1)(D)

for the amount of the bank's loss, two levels were added pursuant to U.S.S.G. § 2F1.1(b)(2) for more than minimal planning. Finally, and despite Chapman's demonstrated lack of remorse,[3] two levels were subtracted pursuant to U.S.S.G. § 3E1.1(a) for acceptance of responsibility because Chapman had confessed to the bank fraud charge. This resulted in a final offense level of 9.

Chapman had an extremely long, continuous, and sometimes violent criminal history, including burglary while armed with a .25 caliber handgun. Thirty-three criminal history points were applied to Chapman as a result of his 13 convictions, as well as two points for committing the instant offense while on supervised release, and one point because the offense occurred within two years of his release from custody. U.S.S.G. § 4A1.1. Chapman's total of 36 criminal history points was well beyond (nearly triple) the 13 points needed to place him in Criminal History Category VI, the highest category reflected in the Guidelines.

The combination of an offense level of 9 and a Criminal History Category VI resulted in a guideline sentencing range of 21 to 27 months. U.S.S.G. § 5A (Sentencing Table). Pursuant to

---

[3] Chapman still appears to believe that he was entitled to do what he did because Jollatta had not paid his medical bills.

U.S.S.G. § 4A1.3, however, a sentencing judge may depart upward from a guideline sentencing range where the criminal history category inadequately reflects "the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3. Because of Chapman's egregious criminal record, as well as his notable recidivist tendencies, the district court sentenced him to 32 months for the bank fraud, only a five-month, or 18-19 percent, upward departure.

Finally, the district court required that Chapman's 24-month sentence for revocation of supervised release and his 32-month sentence for bank fraud run consecutively rather than concurrently, resulting in a total prison term of 56 months. Chapman appeals the decision to run his sentences consecutively, the two-level adjustment for more than minimal planning, and the upward departure from the sentencing guideline range because of his underrepresented criminal history. None of the other sentencing determinations is challenged here.

## II. CONSECUTIVE SENTENCES

Chapman argues that his sentences for bank fraud and for revocation of supervised release should have been imposed to run concurrently and not consecutively. However, Chapman not only fails to address the relevant guideline, but the argument

he does make is without merit. He contends that, pursuant to 18 U.S.C. § 3584(a), the district court has the discretion to impose either concurrent or consecutive sentences, and that in this case that discretion was abused when the district court did not consider the mitigating fact that his crime was a result of his sudden release from prison. We do not agree.

Section 5G1.3 of the Sentencing Guidelines governs whether a new sentence imposed upon a defendant already subject to an undischarged term of imprisonment should run concurrently or consecutively to the existing term. Application Note 6 deals with revocations:

> If the defendant was on federal or state probation, parole, or supervised release at the time of the instant offense, and has had such probation, parole, or supervised release revoked, the sentence for the instant offense should be imposed to run consecutively to the term imposed for the violation of probation, parole, or supervised release in order to provide an incremental penalty for the violation of probation, parole, or supervised release.

We have held that this application note,[4] despite its use of "should," is mandatory. United States v. Gondek, 65 F.3d 1, 3 (1st cir. 1995); see also United States v. McCarthy, 77 F.3d 522, 539-40 (1st Cir. 1996) ("In cases where a defendant has

---

[4] At the time of our holdings in Gondek and McCarthy, this identical note was identified as Application Note 4.

committed a federal offense while on probation, Note 4 expressly limits a district court's discretion in determining a reasonable incremental punishment by providing that the court must order the entire federal sentence to run consecutively to any sentence imposed upon revocation of probation."). Several other circuits--nearly all of those addressing the issue--have agreed with this interpretation. See, e.g., United States v. Alexander, 100 F.3d 24, 26 (5th Cir. 1996) (holding that Application Note 6 is "binding on the courts"); United States v. Bernard, 48 F.3d 427, 430-32 (9th Cir. 1995).

Moreover, and as the district court aptly noted, "as a matter of fact or policy, the only way to effectively enforce supervised release is to require that time in addition to whatever else he is sentenced for is imposed." Otherwise, there effectively would be no punishment at all for violating the conditions of his supervised release. We can conceive of no reason to upset the district court's imposition of consecutive sentences for the revocation of supervised release and the bank fraud itself.

## III. MORE THAN MINIMAL PLANNING

Chapman next argues that the district court erred in adjusting his offense level upward for more than minimal planning pursuant to U.S.S.G. § 2F1.1(b)(2). He contends that

-9-

his actions were impulsive and opportunistic, and thus do not lend themselves to this enhancement. Even if we grant that his decision to abscond with the checks and run was spontaneous, however, the complicated process through which he negotiated the checks belies his contention of impulsiveness.

We review a district court's finding of more than minimal planning for clear error, reversing it only if "we are left with 'the definite and firm conviction that a mistake has been committed." United States v. Rust, 976 F.2d 55, 57 (1st Cir. 1992) (quoting United States v. Vega-Encarnacion, 914 F.2d 20, 24 (1st Cir. 1990)) (vacating a sentence, despite this standard, where the district judge should have made the upward adjustment and did not do so); United States v. Gregorio, 956 F.2d 341, 343 (1st Cir. 1992) (upholding the two-level enhancement).

Application Note 1(f) of § 1B1.1 describes three circumstances to which the "more than minimal planning" enhancement applies: 1) where the amount of planning involved exceeded that which "is typical for commission of the offense in a simple form;" 2) where the defendant has taken significant affirmative steps to conceal the offense; and 3) where the offense involved "repeated acts over a period of time, unless it is clear that each instance was purely opportune." The

government argues, and the district court appears to have determined, that any one of these three justifications for the enhancement applies to Chapman's actions because of the complexity of the scheme.[5]  While we are not convinced that the facts here suggest more planning than is typical for bank fraud, which by its nature requires some sophistication, United States v. Bean, 18 F.3d 1367, 1370 (7th Cir. 1994), it seems quite evident that Chapman's repeated transactions at different bank branches were not "purely opportune."

"Conduct is 'purely opportune' only if it is spur of the moment conduct, intended to take advantage of a sudden opportunity."  Rust, 976 F.2d at 57.  Webster's Third New International Dictionary (1986) defines "sudden" as something that "occur[s] unexpectedly" and "without previous notice," and which was thus "not foreseen or prepared for," such as a thundershower on a clear day.  Although Chapman obviously took advantage of having recently obtained his employer's checks, and

_____

[5] Chapman deposited bad checks in different locations in order to support his withdrawals from the various branches of amounts that were only briefly supported by these phantom deposits.  Determining the right amounts to deposit and withdraw as he went along required both planning and basic math.  The government argues that this qualifies as more than minimal planning.  It also reasons that efforts to conceal are demonstrated by the use of different bank branches (to avoid calling attention to himself), and finally that the series of transactions was not "purely opportune."

-11-

it may seem unlikely that it occurred to him to engage in this scheme at any time prior to his taking the checks and leaving, it nonetheless took two days for him to complete the process of deposits and withdrawals that were the basis of his bank fraud charge. These acts were not "sudden" in any sense.

Because of the myriad criminal opportunities that can arise and the differing ways individuals might act upon them, we need not set forth an exact period of time, after an opportunity presents itself, within which one must act in order to have actions defined as "purely opportune." Chapman's actions were not "purely opportune," and the enhancement for more than minimal planning was not clearly erroneous.

## IV. UPWARD DEPARTURE

Chapman next argues that it was error for the district court to depart upward from the guideline sentencing range on the basis of his long criminal history. U.S.S.G. § 4A1.3. He contends that the district court did not supply an adequate rationale for its decision to do so, but rather made a mechanical leap through the sentencing grid on the basis of numbers alone. Having reviewed the sentencing transcript, we find this contention to be without merit.

Section 4A1.3 provides, in pertinent part: "If reliable information indicates that the criminal history category does

not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range."  In most cases, this means that the court should apply the sentencing guideline range that would result from the next higher criminal history category, or from whichever category the defendant best fits after considering the seriousness of his cumulative offenses.  U.S.S.G. § 4A1.3.  Because Category VI is the highest contemplated by the grid, the Commission addressed this problem in the following way:

> [T]here may, on occasion, be a case of an egregious, serious criminal record in which even the guideline range for Criminal History Category VI is not adequate to reflect the seriousness of the defendant's criminal history.  In such a case, a departure above the guideline range for a defendant with Criminal History Category VI may be warranted.  In determining whether an upward departure from Criminal History Category VI is warranted, the court should consider that the nature of the prior offenses rather than simply their number is often more indicative of the seriousness of the defendant's criminal record. . . . Where the court determines that the extent and nature of the defendant's criminal history, taken together, are sufficient to warrant an upward departure from Criminal History Category VI, the court should structure the departure by moving incrementally down the sentencing table to the next higher offense level in Criminal

-13-

History Category VI until it finds a guideline range appropriate to the case.

U.S.S.G. § 4A1.3. In other words, when the court cannot increase the criminal history category (because there is none higher), but would otherwise be justified in so doing, it may instead adjust upward the offense level in order to arrive at an appropriate sentence.

Although Chapman devotes barely over one page in his brief to this entire issue, and does not cite to the guideline language, his arguments appear to be based primarily on the above quoted text. In essence, he contends that the court should have considered the nature and context of his crimes, and not just their number.

We have consistently followed a tripartite methodology for analyzing upward departures originally chiseled in United States v. Diaz-Villafane, 874 F.2d 43, 49 (1st Cir. 1989). That methodology requires that we apply a different standard of review to each step in the process. We look first at the legal justification for departure, in the abstract, using a de novo standard. Id. Secondly, and assuming that we are satisfied with the district court's interpretation of the law as considered in step one, we look at the factual record to ascertain whether there are circumstances sufficient to warrant the departure in the case at hand. Id. Because this is a

-14-

question of fact, we leave the district court's determination of the matter untouched absent clear error.  Id.  Assuming, after the first two steps, that we are still satisfied with the conclusions reached below, we look finally at the extent of the departure.  Id.  The standard we use at this stage is one of reasonableness.  Id.

The first two prongs of the test are quite simple in the present case, and thus may be dispensed with quickly.  Based on the section of the Sentencing Guidelines discussed above, there is no question that an egregious criminal history, not properly accounted for under the Guideline structure, is a proper legal ground for an upward departure.  It is also quite clear from the record that Chapman's criminal history is indeed overwhelming.  Not only did he have 36 criminal history points (which, on a scale that goes up to 13, certainly is extreme), but his recidivism was nearly always immediate, and some of his crimes were violent (burglary, which is deemed a violent crime by the Guidelines because of the potential for injury if there is an encounter with the resident).  The district court noted that Chapman's was "amazingly one of the worst record[s] I have seen in recent years," and we defer to that assessment in light of the district court's more direct experience with this defendant and those with whom he is now compared.

-15-

Chapman's real point of contention in this appeal goes to the third Diaz-Villafane prong.  Under the Guidelines, a sentencing judge is expected to articulate some rationale for both the departure itself and the extent of that departure. United States v. Ocasio, 914 F.2d 330, 336 (1st Cir. 1990).  As discussed above, Chapman's sentence of 32 months reflects a five-month departure from the 21-27 month guideline range. Chapman contends that the district court made a mechanical move through the guideline grid based purely on his criminal history score, but without considering the context of his past behavior and without providing adequate reasoning for its decision to add five months specifically.

"Reasonableness is a concept, not a constant," id., and "[t]here is no scientifically precise litmus test by which the reasonableness of departure decisions can be resolved," id. at 337.  Because we cannot create bright-line rules for this aspect of the sentencing process, we give substantial leeway to district courts in their efforts to determine the proper sentence for a particular defendant.  See Diaz-Villafane, 874 F.2d at 49-50 ("This third step involves what is quintessentially a judgment call . . . . We will not lightly disturb decisions to depart, or not, or related decisions implicating degrees of departure.").  Although some

-16-

justification is required, "[w]e do not think that a district court must dissect its departure decision, explaining in mathematical or pseudo-mathematical terms each microscopic choice made in arriving at the precise sentence." United States v. Emery, 991 F.2d 907, 913 (1st Cir. 1993). Indeed, the district court's reasoning for whether to depart often can be applied, without further discussion, to the determination of the extent of that departure, at least in § 4A1.3 cases. Id. ("[W]hen the court has provided a reasoned justification for its decision to depart, and that statement constitutes an adequate summary from which an appellate tribunal can gauge the reasonableness of the departure's extent, it has no obligation to go further and attempt to quantify the impact of each incremental factor on the departure sentence.").

This case is similar, on this particular issue, to United States v. Black, 78 F.3d 1, 8-9 (1st Cir. 1996), in which we dealt with the following circumstances:

> Black says that the district court acted mechanically, imposing the departure basically because Black had far more points than the minimum for category VI. This is not a complete description of what happened: the district judge mentioned the point differential but followed this with a lengthy recitation of Black's actual criminal history, which we have already quoted.

This is precisely what happened in the instant case. The district court noted the excessive criminal history points, but also expressed concern about the violent nature of burglaries, as well as Chapman's consistent recidivism. As we stated in Black, "we will not remand for an explanation that is so clearly implicit in what the district court found." Id. at 9. Thus, the district court provided adequate reasoning for us to consider in determining the reasonableness of the departure's extent.

The extent of the departure in this case is relatively minor. Chapman's sentence was increased by 5 months, or approximately eighteen percent. Compared with our prior cases affirming upward departures, the upward departure was modest. See, e.g., United States v. Brewster, 127 F.3d 22, 31 (1st Cir. 1997) (affirming an upward departure of 22 months, or about 50%, on the basis of uncounted prior convictions and uncharged domestic violence); United States v. Hardy, 99 F.3d 1242, 1253 (1st Cir. 1996) (affirming a 300% upward departure); Black, 78 F.3d at 7-8 (affirming an upward departure of 16 months, or about 30%, on the basis of a criminal history score of 21); United States v. Doe, 18 F.3d 41, 48-49 (1st Cir. 1994) (affirming an upward departure of 45 months, or about 167%); Emery, 991 F.2d at 914 (affirming an upward departure of 21

months, or about 41%, on the basis of a criminal history score of 20); <u>United States</u> v. <u>Brown</u>, 899 F.2d 94, 96 (1st Cir. 1990) (affirming an upward departure of 12 months, or about 133%, on the basis of a criminal history score of 20); <u>Diaz-Villafane</u>, 874 F.2d at 51-52 (affirming an upward departure of 87 months, or 264%).

We find no error in the court's upward departure determination.

### V. CONCLUSION

For the foregoing reasons, the district court's sentencing decisions are **affirmed**.