**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

ANDREW L. LICHTENBERG,
          *Defendant-Appellant.*

No. 09-10191

D.C. No.
1:05-cr-00496-SOM

OPINION

Appeal from the United States District Court
for the District of Hawaii
Susan Oki Mollway, Chief District Judge, Presiding

Argued and Submitted
October 13, 2010—Honolulu, Hawaii

Filed January 27, 2011

Before: Michael Daly Hawkins, M. Margaret McKeown and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Hawkins

## COUNSEL

Peter C. Wolff, Jr., Federal Public Defender, Honolulu, Hawaii, for the defendant-appellant.

Lawrence L. Tong and Clare E. Connors, Assistant United States Attorneys, Honolulu, Hawaii, for plaintiff-appellee.

---

## OPINION

HAWKINS, Senior Circuit Judge:

In this sentencing appeal, defendant Andrew Lichtenberg ("Lichtenberg") challenges his 112-month sentence, imposed following a remand from this court, for wire fraud, money laundering, and making a false statement in connection with a passport application, arguing the district court improperly calculated his criminal history points, improperly imposed an above-Guidelines sentence for factors already taken into consideration by the Guidelines, and imposed a substantively unreasonable sentence. We affirm.

## FACTS AND PROCEDURAL HISTORY

Lichtenberg was convicted of wire fraud, money laundering and false statement on a passport application. The charges arose from a real estate transaction in which he had been hired to assist an elderly client from Louisiana with the sale of her interest in a piece of property on Kauai. The client paid Lichtenberg $1,800 and gave him explicit instructions regarding handling the proceeds of the sale, which were to be wired directly to her account. Having previously had a bad experience with a power of attorney, the client refused to give Lichtenberg one and explicitly refused to have the funds placed into Lichtenberg's client trust account.

Against those instructions, Lichtenberg had the escrow company wire the sale proceeds of $373,000 to his client trust account. A day later, he transferred $100,000 by wire to Indonesia[1] and purchased two cashier's checks in the amount of

---

[1] Lichtenberg's wife and her family lived in Indonesia. Indonesia lacks an extradition treaty with the United States. When Lichtenberg was ulti-

$100,000 each, payable to himself. Depositing these checks into a checking account and savings account, then wiring the full amount of the savings account to a bank in Indonesia, Lichtenberg closed his law practice and left for Indonesia using a fraudulently-obtained passport.[2]

Lichtenberg testified at his trial and denied any wrongdoing. The jury convicted him of all counts except for one count of mail fraud. At his original sentencing, the district court indicated agreement with the presentence report's calculation of Lichtenberg's base level and criminal history points. This included enhancements for vulnerable victim, abuse of trust, obstruction of justice and use of a fraudulently obtained passport, resulting in an advisory Guidelines range of 70-87 months. The district court told Lichtenberg it was actually considering a sentence of eleven and one-half years (138 months), noting it was influenced in part by his refusal to cooperate with returning any of the money to the victim. At this point, Lichtenberg indicated he had $200,000 in an account in Indonesia that he was willing to give his client, though still claiming this was not her money, but his personal savings account. The court agreed to give Lichtenberg some time to see if he could cooperate with the government in getting the funds back from Indonesia, and this was eventually accomplished after nearly a year. However, Lichtenberg never accounted for what happened to the remaining $173,000. It

mately arrested in Bali, Indonesia, he was apparently "very insistent that he should never have been removed from Indonesia because there was a lack of an extradition treaty"; in his first appeal, Lichtenberg also challenged the federal courts' jurisdiction over him for similar reasons. *United States v. Lichtenberg*, 2009 WL 118937, at *1 (9th Cir. 2009).

[2]The indictment alleged that Lichtenberg had applied for an expedited replacement passport, claiming he had "lost" his original passport, when in fact it had been seized by the court in an unrelated state court proceeding. The jury convicted Lichtenberg of making false statements in the application and use of a passport, and Lichtenberg does not contest this conviction on appeal.

was also discovered during this time that the interest from the $200,000 was going into a separate account, from which Lichtenberg's wife was withdrawing the full amount of interest each month. The court ultimately sentenced Lichtenberg to 126 months, noting it remained concerned by his lack of candor and incomplete information regarding the additional funds.

On appeal, we affirmed Lichtenberg's conviction for wire fraud, but reversed two of the money laundering counts. *United States v. Lichtenberg*, 2009 WL 118937 (9th Cir. 2009). We also affirmed the application of the vulnerable victim enhancement and the use of a fraudulently obtained passport enhancement. We left for the district court to address an issue Lichtenberg raised for the first time in that appeal: the inclusion in his criminal history calculation of two state convictions for violating a protective order. *Id.* at *2.

At resentencing, the district court considered Lichtenberg's arguments regarding criminal history, but concluded that his conviction for violating a domestic protection order was not sufficiently similar to contempt of court to qualify for exclusion from criminal history consideration. The resulting applicable Guidelines range was 63-78 months, but the court again decided to impose an above-Guidelines sentence, based largely on the same reasons given at the previous sentencing. The court also gave Lichtenberg some credit for his belated expression of remorse, sentencing him to 112 months. This appeal followed.

## STANDARD OF REVIEW

The district court's calculation of the Guidelines, including the inclusion of a prior conviction for criminal history purposes, is reviewed de novo. *United States v. Hernandez-Hernandez*, 431 F.3d 1212, 1220 (9th Cir. 2005). The district court's ultimate sentence, including the extent of any departure from the advisory Guidelines range, is reviewed for "rea-

sonableness." *United States v. Mohamed*, 459 F.3d 979 (9th Cir. 2006).

## DISCUSSION

### I.

Lichtenberg claims error in the calculation of his applicable Guidelines range based on the district court's assessment of criminal history points for his convictions of violating a state domestic relations protective order.[3] His argument is that violation of a state protective order is "similar to" a contempt of court violation, which is expressly excluded from criminal history calculation under U.S.S.G. § 4A1.2(c)(1).

**[1]** The Application Notes to the Guidelines offer some guidance for determining whether an offense is "similar to" an excluded listed offense:

> [T]he court should use a common sense approach that includes consideration of relevant factors such as (i) a comparison of punishments imposed for the listed and unlisted offenses; (ii) the perceived seri-

---

[3] In February 2002, Lichtenberg was arrested and charged in two separate matters, one charging eight counts of violating the order of protection (no description of the events was available) and another charging two counts of violating the same order by sending his ex-wife a Valentine card and then telephoning her to ask if she had received it. He was convicted and sentenced to 200 hours community service and $550 in fines on the first eight counts, and 100 hours community service and two days confinement on each of the latter two counts.

The second arrest occurred in September 2002 for one count of violating the same protective order. Lichtenberg's wife was having lunch at a Borders Bookstore when he approached her and tapped her shoulder; she asked him to leave and he did, but then later approached her again outside Borders and apologized for violating the protective order. He was sentenced to 100 hours community service, fined $200, and ordered to participate in a domestic violence intervention program.

ousness of the offense as indicated by the level of punishment; (iii) the elements of the offense; (iv) the level of culpability involved; and (v) the degree to which the commission of the offense indicated a likelihood of recurring criminal conduct.

U.S.S.G. 4A1.2 cmt. n.12(A) (2007).[4] If federal law is available, then the comparison should be between the federal version of the listed offense and the crime which the defendant contends is "similar to" the excluded listed offense. *United States v. Kemp*, 938 F.2d 1020, 1023-24 (9th Cir. 1991).

**[2]** A comparison of punishments is of limited value in this case because the federal contempt statute, 18 U.S.C. § 401, does not specify any range of punishments. Thus, a violation of the federal statute could technically result in a lengthy sentence, which would be substantially greater than the misdemeanor provisions of the Hawaii statute, H.R.S. § 586-11. But federal contempt could also result in no incarceration at all, whereas the Hawaii statute *requires* jail time under a number of scenarios and permits it in others. *See id.* We thus consider this a neutral factor.

In addition, we recently held that, in applying the common-sense approach of Application Note 12, we will place more importance on the actual punishment given, rather than the statutory range of punishments theoretically available. *Grob*, 2010 WL 4486751, at *3. Here, Lichtenberg received a combination of fines, community service and minimal jail time. While these punishments are relatively minor and likely similar to punishments imposed for contempt of court, we note

---

[4]As we recently explained, this application note was added in November 2007 to resolve a circuit conflict regarding the manner in which a court should determine whether a non-listed offense is "similar to" an offense listed in § 4A1.2(c)(1) or (2). *United States v. Grob*, ___ F.3d __, 2010 WL 4486751, at *2-3 (9th Cir. 2010). This note adopted the"common-sense" multi-factored test previously employed by the Second, Fifth, and Seventh Circuits. *See id.* at *2.

that Lichtenberg was also ordered to participate in a domestic violence intervention program as part of his punishment. *See* H.R.S. § 586-11(a). As discussed more below, this distinction highlights what we believe is an important difference in the two crimes — the violation of a domestic protection order always involves a victim that the court is attempting to protect from physical harm and/or emotional harassment.

**[3]** Thus, although the punishments for violating a Hawaii state protective order are relatively minor, in reviewing the remaining factors identified by the Guidelines, we conclude that the Hawaii violation for breach of a protective order is not similar to contempt of court. While both crimes involve knowing violation of a court order, an initial finding of domestic abuse or the potential for domestic abuse (which may include emotional harm to the victim) is required before a protective order may issue in the first place. H.R.S. §§ 586-3; 586-4–5.5. The crime elements thus differ because violating a *specific type of order* is required for the Hawaii state protective order violation conviction.[5] As one district court explained:

> The elements for these offenses [contempt of court and violating a protective order] are closely related because both require a defendant to willfully violate a court order. However, the nature of the order that an actor violates distinguishes these offenses. In a Protective Order Violation, a defendant must violate a domestic abuse protective order, while contempt of court does not require a defendant to violate a partic-

---

[5]Although under Hawaii law a violation of the state protective order may also be prosecuted as contempt of court, Lichtenberg fails to appreciate that the converse is not true. *See Naluai v. Naluai*, 55 P.3d 856, 860-61 (Haw. Ct. App. 2002). That is, contempt of court might be a lesser-included offense of violating a protective order and the prosecutor is free to choose which statute to proceed under, but it is the existence of the domestic protection order itself that sets the offense apart from the run-of-the-mill violation of a court order.

ular order. This distinction is meaningful. When a
defendant violates an Order of Protection, the defen-
dant creates a risk of immediate harm to those pro-
tected by the Order of Protection. In contrast,
Contempt of Court does not necessarily present any
risk of injury to others.

*United States v. Bastian*, 650 F. Supp. 2d 849, 872 (N.D. Iowa
2009), *aff'd* 603 F.3d 460 (8th Cir. 2010).[6]

**[4]** The distinction between the two crimes is reflected in
Lichtenberg's actual offense conduct. *See Grob*, 2010 WL
4486751, at *5. Lichtenberg's violations, including sending a
Valentine's card, calling his ex-wife, and then approaching
her, fall squarely within the protective order his ex-wife had
obtained for the express purpose of freeing herself from con-
tact with Lichtenberg. Although he did not physically harm
his ex-wife, Lichtenberg's repeated violation of the protective
order at least "create[d] a meaningful risk of immediate harm"
to her. *Bastian*, 650 F. Supp. 3d at 872. This conduct was not
undirected conduct with no identifiable victim, and was there-
fore unlike a contempt of court violation.

**[5]** The level of culpability involved also differs because a
breach of a protective order violates not only the integrity of
the court system[7] but the safety of the individual the order was
specifically designed to protect. *See id.*; *United States v. Per-
kins*, 421 F. Supp. 2d 209, 213-14 (D. Me. 2006); *see also
United States v. Daigle*, 564 F. Supp. 2d 50, 60 (D. Me. 2008)
("Without minimizing the seriousness of generic contempt of
court, the risks that accompany the willingness of a domestic
partner to intentionally violate no-contact orders in cases of
pending domestic violence are well-documented, all too fre-

---

[6]Bastian did not appeal the criminal history calculation decision, and
thus the Eighth Circuit decision does not discuss this issue.

[7]*See Young v. United States,* 481 U.S. 787, 800 (1987) (criminal con-
tempt serves "limited purpose of vindicating the authority of the court").

quent, and all too often tragic."). Although Lichtenberg argues that violation of a protective order under Hawaii law does not require any type of threatening or abusive contact, and that his violations did not involve any such conduct, he fails to recognize that the protective order could not issue in the first place without a showing that there has been or is the potential threat of domestic abuse, which may include physical harm, threats, psychological abuse, or property damage. *See* H.R.S. § 586-1. Even absent physical violence or threats, his repeated violations of the protective order present precisely the type of emotional harassment the order is designed to prevent. *Cf. Bastian*, 650 F. Supp. 2d at 873 ("By violating an Order of Protection, the defendant repeats the type of conduct that necessitated the implementation of the Order of Protection in the first instance."); *see also Grob*, 2010 WL 4486751, at *6 (looking to facts of the "entire episode which led to the prior conviction" when considering level of culpability) (quoting *United States v. Reyes-Maya*, 305 F.3d 362, 367 (5th Cir. 2002)).

**[6]** The final consideration is the likelihood of recurring criminal conduct. The Hawaii statute includes escalating penalties for repeated violations of protective orders, suggesting the legislature anticipated a likelihood of recidivism with this crime, perhaps due to the emotionally-charged nature of the parties' relationship. *See generally* H.R.S. § 586-11. Indeed, Lichtenberg's convictions reveal that he violated the protective order eleven times in a period of only a few months, demonstrating a significant risk of recurring criminal conduct.

While Lichtenberg's appellate counsel made a thoughtful argument to the contrary, on balance we see the factors tipping in favor of finding the crimes are dissimilar because of the type of court order involved, the initial showing required to obtain that type of order, and the identifiable victim always present in that type of order. This in turn escalates the culpability level beyond merely flaunting the court's authority. The likelihood of recidivism also appears higher with this crime

than with ordinary contempt of court, as amply illustrated in this case. We therefore affirm the district court's inclusion of Lichtenberg's convictions in his criminal history calculation.

## II.

**[7]** With respect to the reasonableness of his sentence,[8] Lichtenberg is correct that some of the facts the court relied on to impose an above-Guidelines sentence were already taken into account by the Guidelines and the various enhancements imposed. However, the court also identified additional facts which were of a different nature than those required for the enhancements, including Lichtenberg's use of his knowledge of extradition law to attempt to avoid capture and/or payment of restitution, and his lack of candor with the court throughout a lengthy sentencing process that further hindered restitution efforts and allowed his wife to live off the interest income of the ill-gotten assets. *See United States v. Black*, 78 F.3d 1, 6 (1st Cir. 1996) (finding defendant's attempt to frustrate restitution by secreting assets was a new and different act of misbehavior which could justify an upward departure in addition to obstruction enhancement already applied for perjury at trial). The district court further identified a need for a rather lengthy sentence to prevent Lichtenberg from profiting from the crime by moving outside the United States to live comfortably off the money he had stolen, about half of which was never recovered. Especially given the deferential standard of review, *see United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1055 (9th Cir. 2009), we conclude the 112-month sentence is not substantively unreasonable. Lichtenberg's argument regarding sentencing disparities—based on data from

---

[8]Lichtenberg also argues that the district court "procedurally erred" by relying on factors already accounted for by the Guidelines to justify an upward departure from the Guidelines range. However, post-*Booker*, this court's review of upward departures from the advisory Guidelines merges with this court's review of the ultimate sentence for reasonableness, and is not reviewed as a separate issue. *Mohamed*, 459 F.3d at 986.

2006 regarding the "average" sentences for fraud and money laundering—is without merit. *See United States v. Treadwell*, 593 F.3d 990, 1012 (9th Cir. 2010) ("The mere fact that [defendant] can point to a defendant convicted at a different time of a different fraud and sentenced to a term of imprisonment shorter than [his] does not create an 'unwarranted' sentencing disparity.").

**AFFIRMED**.