# United States Court of Appeals
## For the First Circuit

No. 16-1246

UNITED STATES OF AMERICA,

Appellee,

v.

CHRISTOPHER COOMBS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Selya and Kayatta,
Circuit Judges.

James S. Hewes for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Thomas E. Delahanty II, United States Attorney, was on brief, for
appellee.

May 19, 2017

**SELYA**, **Circuit Judge**.  Defendant-appellant Christopher Coombs strives to persuade us that the district court erred both in denying his multiple motions to suppress incriminating evidence and in fashioning his sentence.  We are not convinced and, therefore, affirm.

## I.  BACKGROUND

We rehearse the facts as supportably found by the district court following an omnibus hearing on the appellant's several motions to suppress.  See United States v. Gamache, 792 F.3d 194, 196 (1st Cir. 2015); United States v. Paneto, 661 F.3d 709, 711-12 (1st Cir. 2011).

In the wake of his 2009 conviction on drug-trafficking charges, the appellant was sentenced to a fifteen-month term of immurement to be followed by a five-year term of supervised release.  He served his prison sentence but, during his final six months under supervision, he again found himself on the wrong side of the law.

In October of 2014, Customs and Border Protection (CBP) agents intercepted a package at John F. Kennedy International Airport in New York.  An air waybill — a document completed by the sender that includes the package's origin, destination, and a description of its contents — accompanied the package.  The air waybill indicated that the package was from "Marry" in Shanghai

and was to be delivered at the appellant's residence in Westbrook, Maine.  The contents were described as "[p]olycarbonate."

Inspection of the contents revealed an amber-colored crystal (a rock-like substance).  The agents conducted a chemical field test and received a reading that was positive for methylenedioxymethamphetamine (MDMA), commonly known as ecstasy. A second analysis, conducted in Portland, Maine, at a Department of Homeland Security (DHS) facility, detected alpha-pyrrolidinopentiophenone (alpha-PVP), a type of synthetic cathinone.  Synthetic cathinones are colloquially known as bath salts.[1]

On October 31, DHS agents and local police, in conjunction with the U.S. Postal Service, executed a controlled delivery of the package (with the contents safely removed) to the appellant at his Westbrook address.

While the controlled delivery was underway, the officers sought an anticipatory search warrant for the appellant's

---

[1] Bath salts are a relatively new phenomenon in the drug enforcement arena.  See Nat'l Drug Intelligence Ctr., U.S. Dep't of Justice, Synthetic Cathinones (Bath Salts): An Emerging Domestic Threat 5 (2011).  They have come into use as surrogates for better-known drugs such as ecstasy, methamphetamine, and cocaine.  See id.  Of late, bath salts have become a particular problem in Maine.  See, e.g., McCue v. City of Bangor, 838 F.3d 55, 57-60 (1st Cir. 2016); United States v. Ketchen, No. 1:13-cr-00133, 2016 WL 3676150, at *7-9 (D. Me. July 6, 2016); Skoby v. United States, Nos. 1:11-cr-00208, 1:14-cv-00352, 2015 WL 4250443, at *3 (D. Me. July 13, 2015).

residence.  In support of probable cause, they represented, inter alia, that the substance in the package had tested positive for MDMA and alpha-PVP.  A state magistrate issued the search warrant, with the caveat that it should be executed only if the appellant took the parcel inside his home.

As matters turned out, the appellant accepted the parcel while standing outside the building, and the officers promptly took him to the ground.  He was arrested on the spot and never brought the package into his home.  The officers described the appellant's manner at the time of the detention as "nerved up" but cooperative.  By the time that news of the warrant arrived at the scene, the appellant already had consented to a search of his residence and had signed a form to that effect.

Following the appellant's arrest, officers transported him to the police station and read him his Miranda rights.  See Miranda v. Arizona, 384 U.S. 436, 478-79 (1966).  The appellant stated that he had ordered the package and some other shipments from China on behalf of a third party.  When packages arrived, the appellant would deliver them to the requesting individual and would be paid for his trouble.  The intercepted parcel, he said, represented the largest order that he had placed.  When asked if alpha-PVP "sounded familiar," he responded in the affirmative.

During a search of the appellant's residence, officers seized a computer, a tablet, and five cell phones.  Thereafter,

- 4 -

the appellant — still in custody — exchanged telephone calls with his wife. A standard recording at the beginning of each call warned him that the conversations would be recorded and monitored. When his wife noted that the authorities had taken his electronic gear, he asked her to delete receipts from two e-mail accounts and supplied her with the passwords. In a subsequent conversation, the appellant sought to confirm that his wife had not only deleted the receipts but also had emptied the trash folders to "make sure they were deleted securely."

In due course, the government sought and received warrants authorizing the search of the five cell phones found at the appellant's residence and the two e-mail accounts that he had mentioned to his wife. The search of the e-mails disclosed several exchanges between the appellant and overseas pharmaceutical companies, in which the appellant, in his own words, solicited "apvp (or similar products)." In addition, he made inquiries as to pricing and quantities and placed several orders.

Subsequent to the issuance of the last of the warrants, the seized amber-colored crystal was subjected to more sophisticated laboratory testing. This testing was conducted at a Drug Enforcement Administration (DEA) laboratory. It revealed, for the first time, that the substance was alpha-pyrrolidinohexanophenone (alpha-PHP) rather than alpha-PVP. Although these substances were (and are) both regulated as

controlled substances — illegal bath salts — the two have different chemical compositions.

At the time of the appellant's offensive conduct, alpha-PVP was regulated pursuant to the Attorney General's authority to designate controlled substances temporarily, as needed, in order to "avoid imminent hazards to public safety."[2]  21 U.S.C. § 811(h); see Schedules of Controlled Substances: Temporary Placement of 10 Synthetic Cathinones Into Schedule I, 79 Fed. Reg. 12,938, 12,938 (Mar. 7, 2014).  On the other hand, alpha-PHP was (and is) regulated as a controlled substance analogue, meaning that it is "substantially similar" to a controlled substance, 21 U.S.C. § 802(32)(A), and thus may be regulated as such if intended for human consumption, see id. § 813; see also McFadden v. United States, 135 S. Ct. 2298, 2302 (2015) (explicating relevant statutory scheme).

On January 15, 2015, a federal grand jury sitting in the District of Maine handed up a two-count indictment against the appellant. Count one charged possession with intent to distribute alpha-PHP, a schedule I controlled substance analogue.  See 21 U.S.C. §§ 802(32)(A), 813, 841(a)(1).  Count two, which focused on

---

[2] Although it makes no difference for present purposes, alpha-PVP has since been permanently designated as a schedule I controlled substance.  See Schedules of Controlled Substances: Placement of 10 Synthetic Cathinones Into Schedule I, 82 Fed. Reg. 12,171, 12,172 (Mar. 1, 2017) (codified at 21 C.F.R. § 1308.11(d)(61)).

the appellant's instructions to his wife to delete certain e-mails, charged obstruction of justice. See 18 U.S.C. § 1512(b)(2)(B).

The appellant maintained his innocence and filed five separate motions to suppress. Following an omnibus hearing, the district court — ruling in an electronic order — deemed the first suppression motion moot[3] and denied the four remaining motions. The appellant thereafter entered a conditional guilty plea to counts one and two, see Fed. R. Crim. P. 11(a)(2), reserving the right to appeal the denial of his quartet of motions to suppress.

Without objection, the district court calculated the appellant's guideline sentencing range as fifty-seven to seventy-one months. The court then sentenced the appellant to a concurrent five-year incarcerative term on each count of conviction, to be followed by five years of supervision. At the same time, the court dealt with the appellant's admitted violation of his earlier supervised release and imposed a 366-day incarcerative sentence for that violation. The court decreed that the revocation-of-

---

[3] The first suppression motion sought to challenge the anticipatory search warrant, which had no effect unless and until the appellant brought the package inside his residence. See generally United States v. Ricciardelli, 998 F.2d 8, 10-11 (1st Cir. 1993) (explaining use of anticipatory search warrants for controlled deliveries of contraband). As events played out, the officers detained the appellant before he brought the package inside. Consequently, the government agreed to withdraw the warrant and to disregard it as a basis for the search of the appellant's home.

supervised-release sentence would run consecutively to the concurrent sentences imposed with respect to the offenses of conviction.

The appellant moved to modify the judgment. Pertinently, he sought to reduce his new term of supervision from five years to three years. The court granted this entreaty in part, reducing the supervised release term for count two to three years (the statutory maximum for that count, see 18 U.S.C. §§ 3559(a)(3), 3583(b)(2)). This timely appeal followed.

## II. ANALYSIS

In this venue, the appellant challenges the denial of four of his motions to suppress. We address the first two of these motions together and then examine the other two motions separately. Thereafter, we scrutinize the appellant's claims of sentencing error.

### A. Suppression.

We review a district court's findings of fact on a motion to suppress for clear error. See United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994). This standard requires us to accept not only the court's factual findings but also the reasonable inferences drawn from those discerned facts. See Paneto, 661 F.3d at 711. Questions of law engender de novo review. See Zapata, 18 F.3d at 975.

1.  **The Second and Third Motions to Suppress.** The appellant's second motion to suppress sought to exclude evidence obtained from the five cell phones found in his residence, and the third motion sought to exclude messages recovered from the appellant's two e-mail accounts. The appellant argues that there was no showing of probable cause sufficient to justify the search of his cell phones and e-mails.

A finding of probable cause does not demand proof beyond a reasonable doubt. See United States v. Hoffman, 832 F.2d 1299, 1305-06 (1st Cir. 1987). As relevant here, it demands proof sufficient to support a fair probability that a crime has been committed and that evidence of that crime is likely to be found within the objects to be searched. See United States v. Clark, 685 F.3d 72, 75-76 (1st Cir. 2012); United States v. Ricciardelli, 998 F.2d 8, 10-11 (1st Cir. 1993). The district court concluded that the government's proffer passed through this screen. The appellant's challenge to this conclusion rests on the assertion that the affidavits accompanying the warrant applications contained false information: that the amber-colored crystal in the mailed package was alpha-PVP when, in fact, it was alpha-PHP.

A criminal defendant may impugn the veracity of an affidavit supporting a search warrant if he can show that a false statement, necessary to a finding of probable cause, was included in the affidavit "knowingly and intentionally, or with reckless

- 9 -

disregard for the truth." Franks v. Delaware, 438 U.S. 154, 155-56 (1978). Evidence obtained as a result of a warrant will be suppressed if "the defendant proves intentional or reckless falsehood by preponderant evidence and the affidavit's creditworthy averments are insufficient to establish probable cause." United States v. Tanguay, 787 F.3d 44, 49 (1st Cir. 2015).

In this instance, the challenged affidavits were signed by DHS Special Agent Gary Moulton. Moulton submitted two affidavits: one in support of the search of the five cell phones and the other in support of the search of the two e-mail accounts. Each of Moulton's affidavits incorporated an earlier affidavit from a member of the Westbrook Police Department, Augustin Rodriguez, originally prepared in support of the application for the anticipatory search warrant. See supra note 3. The appellant does not allege that either Moulton or Rodriguez intentionally misled the magistrate in order to obtain search warrants. The question reduces, then, to whether the challenged statements in the affidavit were made "with reckless disregard for the truth." United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002).

Hindsight is always 20/20 and, when viewed in retrospect, the affidavits at some points mis-described the contents of the package. As matters turned out, the package did not contain alpha-PVP but alpha-PHP. It is apodictic, though, that "[e]ven if a warrant issues upon an insufficient showing of

probable cause, suppression may be inappropriate if the officers involved have exhibited objective good faith." United States v. Floyd, 740 F.3d 22, 32 (1st Cir. 2014). This makes perfect sense: the purpose of suppression is to deter police misconduct, see United States v. Leon, 468 U.S. 897, 918-21 (1984), and when law enforcement officers have obtained a search warrant in good faith and acted within its scope, there is "nothing to deter," id. at 921.

Even so, recklessness can defeat a claim of good faith. We have explained that when an affiant "in fact entertained serious doubts as to the truth" of his statements or when "circumstances evincing obvious reasons to doubt the veracity of the allegations" were present, the affiant can be said to have crossed the line into recklessness. Ranney, 298 F.3d at 78 (quoting United States v. Williams, 737 F.2d 594, 602 (7th Cir. 1984)); accord Tanguay, 787 F.3d at 52. In contrast, small inaccuracies in a warrant affidavit do not invalidate the warrant if those inaccuracies result from good-faith mistakes. See, e.g., United States v. Capozzi, 347 F.3d 327, 332-33 (1st Cir. 2003) (emphasizing importance of leeway for affidavits drafted by nonlawyers "under significant time pressure"); United States v. Brunette, 256 F.3d 14, 20 (1st Cir. 2001) (holding that statement that "all" seized images were pornographic when at least two of thirty-three were not was misleading, but did not justify suppression). So, too,

incorrect assertions made in good faith reliance on a third party's errors, or even lies, do not demand suppression.  See United States v. Tzannos, 460 F.3d 128, 138 (1st Cir. 2006).  Nor does sincere reliance on incorrect technical data, even when law enforcement officers themselves are to blame for the bevue.  See United States v. Barnett, 989 F.2d 546, 556-57 (1st Cir. 1993).

Here, the government's first line of defense is that there was no false statement at all: read together, the affidavits simply stated that the amber-colored crystal had tested positive for MDMA and alpha-PVP (which was in fact true).  But this is only part of the story: the affidavits referred, several times, to the substance itself as alpha-PVP.[4]  Neither the government nor the defendant is entitled to cherry-pick an affidavit, focusing only on portions of the affidavit that are helpful to that party's cause and ignoring the remainder.  See Clark, 685 F.3d at 76 (stating that the probable cause analysis requires reading supporting affidavits "as a whole").  By the time of the suppression hearing, the government knew that the amber-colored crystal had been identified definitively as alpha-PHP.  Yet, a fair reading of the affidavits as a whole shows, with conspicuous clarity, that they

_____

[4] For example, Rodriguez's affidavit specifically discussed "remov[ing] a quantity of the Alpha-PVP" from the package before the controlled delivery.  Similarly, one of Moulton's affidavits references the appellant's "receipt of a large quantity of Alpha PVP" on the date of the controlled delivery.

featured the assertion, later revealed to be mistaken, that the amber-colored crystal was alpha-PVP. We therefore reject the government's claim that there was no false statement at all.

To be sure, the affidavits did misstate a fact. Even so, that the affidavits, in hindsight, misstated a fact does not resolve the matter. Rodriguez signed his affidavit on October 31, 2014. Moulton signed the first of his two affidavits on November 6, 2014. He signed the second affidavit on November 14, 2014. But the amber-colored crystal was not accepted for testing at the DEA laboratory until November 14, and the results of that testing were not made available to the DHS until December 9 (long after all of the search warrants had been issued).

There is not a shred of evidence that, when the affidavits were executed and submitted, either affiant knew (or for that matter had any reason to believe) that the amber-colored crystal was not alpha-PVP. The affiants' mistaken assertion was made neither knowingly nor with reckless disregard for the truth. Quite the opposite: the affiants relied on the only laboratory test results then available to them — results that indicated, albeit preliminarily, the presence of MDMA and alpha-PVP. The appellant does not allege that these preliminary tests were conducted negligently or that the affiants acted recklessly in relying upon those results.

- 13 -

When all is said and done, the record in this case contains nothing that shows that either affiant had the slightest reason to entertain serious doubts about the accuracy of the available test results. For aught that appears, the affiants incorporated into their affidavits the best information known to them. Law enforcement officers who prepare warrant affidavits are expected to use care, but they are not expected to be clairvoyant. That a small portion of the information contained in these affidavits ultimately proved to be mistaken does not vitiate the affiants' good faith. See Barnett, 989 F.2d at 556-57.

We could stop here but, for the sake of completeness, we proceed to consider whether the affidavits, even without the statements incorrectly referring to the amber-colored crystal as alpha-PVP, would still demonstrate probable cause. We think that they do.

To begin, the initial laboratory test results would not need to be edited out of the Rodriguez affidavit. Regardless of what the substance eventually proved to be, it is not false to say that the initial tests returned positive readings for MDMA and alpha-PVP. Thus, the Rodriguez affidavit, incorporated in the later Moulton affidavits, would still be read to assert, truthfully, that the contents of the package addressed to the appellant tested positive for controlled substances.

Moreover, Moulton's affidavits would continue to state, truthfully, that the appellant accepted delivery of the package and that he asked his wife to delete receipts from his e-mail accounts after learning that the police had seized his computer. Given these and other statements, we are satisfied that the affidavits, stripped of the false assertion, would still contain enough true facts to establish a fair probability that evidence of a crime would be found through a search of the appellant's cell phones and e-mail accounts. See Tanguay, 787 F.3d at 50.

That ends this aspect of the matter. In the circumstances of this case, the officers' good faith is manifest. They gained no advantage by describing the amber-colored crystal as alpha-PVP rather than alpha-PHP. Both were regulated as controlled substances and, thus, we conclude that the officers reasonably believed that they were dealing with an illicit drug and identified that drug in a way that, though mistaken, did not materially mislead the magistrate. Put another way, had the affidavits referred exclusively to alpha-PHP, their force would not have been diminished. To cinch the matter, the affidavits, stripped of the false assertion, still make out a robust showing of probable cause. It follows that no error, clear or otherwise, tainted the district court's order denying the appellant's second and third motions to suppress.

**2.  The Fourth Motion to Suppress.**  Consent is a well-recognized exception to the requirement that police must have a warrant to search one's home.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Laine, 270 F.3d 71, 74-75 (1st Cir. 2001).  Here, the appellant challenges the denial of his fourth motion to suppress, which sought to invalidate his consent to the search of his residence and exclude the evidence gathered as a result of that search.

The validity of a defendant's consent must be gauged under the totality of the circumstances.  See United States v. Stierhoff, 549 F.3d 19, 23 (1st Cir. 2008).  When evaluating the totality of the circumstances, an inquiring court must look for evidence of coercion, duress, confusion, and the like.  See Schneckloth, 412 U.S. at 227.  A consenting party's mental frailties may have a bearing upon this analysis.  See United States v. Watson, 423 U.S. 411, 424-25 (1976).  But such frailties are entitled to little weight in the abstract.  See United States v. Richards, 741 F.3d 843, 849 (7th Cir. 2014) (explaining that "a person is not precluded from consenting to a warrantless search simply because he or she suffers from a mental disease"); cf. United States v. Palmer, 203 F.3d 55, 61-62 (1st Cir. 2000) ("In the context of the voluntariness of a confession, a defendant's mental state by itself and apart from its relation to official coercion never disposes of the inquiry into constitutional

- 16 -

voluntariness."). For weight to attach, there must be evidence of some nexus between, say, the individual's mental condition and the giving of consent, see United States v. Reynolds, 646 F.3d 63, 73-74 (1st Cir. 2011), or some evidence that officers obtained consent by exploiting a known vulnerability, cf. United States v. Hughes, 640 F.3d 428, 438-39 (1st Cir. 2011) (making same point in context of allegedly coerced confession). When the evidence shows that the consenting party was "responsive, lucid, and cooperative with the police officers," post hoc claims of incompetency inspire suspicion. Reynolds, 646 F.3d at 74.

In the case at hand, the appellant acknowledges that he read and signed a consent form authorizing the search of his residence. That form, among other things, specifically advised him that he had a right not to consent to the search. He nonetheless maintains that his consent was not voluntarily given. He says that he had just been thrown to the ground and arrested, and suggests that he was intimidated and under intense stress. The record, however, undermines this suggestion: Moulton (whose testimony was credited by the district court) stated that more than twenty minutes elapsed between the appellant's arrest and his consent to the search. The appellant appeared cooperative and lucid throughout, even if a bit "nerved up." What is more, no officer's weapon was drawn and no threats were uttered.

- 17 -

The appellant also argues that his history of mental illness — anxiety, depression, and bipolar disorder — vitiated his consent. But the record contains nothing in the way of persuasive evidence that might show a nexus between the appellant's psychiatric history and the giving of consent. Importantly, the officers who testified observed no evidence of mental incapacity during their interactions with the appellant. Overall, he seemed calm, albeit nervous, and was "able to carry on a conversation."

In the last analysis, the voluntariness of the appellant's consent presented an issue of fact for the district court. We have said before that "[w]here the evidence supports two plausible but conflicting inferences, the factfinder's choice between them cannot be clearly erroneous." Laine, 270 F.3d at 76. So it is here: there was ample record support for the district court's conclusion that the appellant, even given his afflictions, was not so stressed by the circumstances that his consent could be regarded as either coerced or otherwise involuntary. We therefore uphold the denial of the appellant's fourth motion to suppress.

3. **The Fifth Motion to Suppress.** Finally, the appellant complains that the district court should have granted his fifth motion to suppress and excluded his statements at the police station following his arrest. In this regard, he notes that there is no documentation either of the Miranda warning or of his purported waiver of his Miranda rights. He does not deny, however,

that the officers advised him of his Miranda rights before interrogating him.

The appellant's argument gains no headway because neither a signed waiver of Miranda rights nor any other form of documentation is required.[5]  See Berghuis v. Thompkins, 560 U.S. 370, 384-85 (2010); see also United States v. Guzman, 603 F.3d 99, 106 (1st Cir. 2010) ("Oral waivers of Miranda rights are sufficient . . . .").  Here, the government produced evidence that the officers not only read the appellant his rights but also received his verbal assurances that he understood those rights.  To be sure, the appellant again points to his history of mental illness to suggest that his waiver of rights was not voluntary.  The officers testified, though, that he was cooperative and responsive during the interview and that there was no reason to doubt the voluntariness of his waiver.  On a cold appellate record, we cannot second-guess the district court's decision to credit the officers' testimony.  We therefore uphold the denial of the appellant's fifth motion to suppress.  See United States v. Pelletier, 469 F.3d 194,

_____

[5] We note, though, that the officers had recording equipment available at the time of the interview but opted not to use it. That decision was unfortunate: recording suspects' interviews is a salutary way to eliminate future questions that may arise both about how a particular interview was conducted and about what was said.  See United States v. Houlihan, 92 F.3d 1271, 1289 (1st Cir. 1996) (decrying policy of deliberately avoiding recording or taking notes during pretrial interviews and explaining that maintaining contemporaneous records safeguards against witnesses changing their stories over time).

201 (1st Cir. 2006) (indicating that findings of voluntariness hinge on credibility determinations).

## B. **Sentencing.**

This brings us to the appellant's claims of sentencing error. As a general matter, we review such claims for abuse of discretion. See Gall v. United States, 552 U.S. 38, 41 (2007); United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008). We first resolve any claims of procedural irregularity and then address any challenge to the substantive reasonableness of the sentence. See United States v. Demers, 842 F.3d 8, 12 (1st Cir. 2016); Martin, 520 F.3d at 92.

Here, the appellant musters both procedural and substantive claims. First, he assigns error to the district court's decision to run his 366-day sentence for the violation of his earlier supervised release term consecutively to his concurrent five-year sentences for the offenses of conviction. Second, he insists that those concurrent five-year sentences are substantively unreasonable. We address these claims separately.[6]

1. **Consecutive Sentence.** The appellant assails the district court's decision to run his 366-day sentence for violating his earlier supervised release term consecutively to the

---

[6] In his appellate brief, the appellant advanced yet another claim of sentencing error, challenging the five-year term of supervised release imposed on count one. At oral argument in this court, the appellant abandoned that claim.

concurrent five-year sentences for the offenses of conviction.  In support, the appellant relies on 18 U.S.C. § 3584(a), which draws a distinction between "terms of imprisonment imposed at the same time" and those "imposed at different times."  The sentences here fell into the former classification and, with respect to that classification, the statute provides that such sentences should run concurrently "unless the court orders" otherwise.  Id.

A decision as to whether to run sentences concurrently or consecutively normally rests in the sentencing court's informed discretion.  See United States v. Román-Díaz, 853 F.3d 591, 597 (1st Cir. 2017); United States v. Carrasco-de-Jesús, 589 F.3d 22, 29 (1st Cir. 2009).  Section 3584(a) does not create an exception to this standard.  The plain language of the statute makes pellucid that a sentencing court has discretion to run sentences imposed at the same time for different crimes either concurrently or consecutively.  In such a situation, the statute makes concurrent sentences the default rule but gives the sentencing court discretionary authority to deviate from that rule.  See United States v. García-Ortiz, 792 F.3d 184, 194 (1st Cir. 2015).

The appellant's challenge runs headlong into the abuse-of-discretion standard of review.  Given the district court's concerns about the appellant's cavalier attitude toward the law, see infra Part II(B)(2), we think that its decision to run the

sentences consecutively fits comfortably within the compass of its discretion.

Relatedly, the appellant argues that the imposition of consecutive sentences in this case amounts to double-counting. In his view, he is being punished twice for the same act because the conduct underlying the counts of conviction forms the basis for the revocation of his supervised release term. This argument, too, lacks force.

Where, as here, conduct committed by a person while on supervised release transgresses the criminal law as well as the conditions of supervision, there is no legal impediment in sentencing the defendant both as a criminal and as a supervised release violator. See United States v. Chapman, 241 F.3d 57, 61 (1st Cir. 2001). Were the rule otherwise, a defendant would effectively escape meaningful punishment for violating his supervised release conditions. See id.

By the same token, there is no legal impediment to imposing the sentences to run consecutively. See United States v. Quinones, 26 F.3d 213, 216 (1st Cir. 1994). Indeed, the sentencing guidelines envision precisely such a scenario:

> [a]ny term of imprisonment imposed upon the revocation of probation or supervised release shall be ordered to be served consecutively to any sentence of imprisonment that the defendant is serving, whether or not the sentence of imprisonment being served resulted

> from the conduct that is the basis of the revocation of probation or supervised release.

USSG §7B1.3(f).

**2. _Substantive Reasonableness._** The appellant's last plaint is that his concurrent five-year sentences are substantively unreasonable. Specifically, he complains that these sentences offend the "parsimony principle" because they are "greater than necessary to achieve the purposes of sentencing." United States v. Dunston, 851 F.3d 91, 100 (1st Cir. 2017); see 18 U.S.C. § 3553(a). Even though this plaint was not voiced below, our standard of review is unsettled. See Demers, 842 F.3d at 14; United States v. Ruiz-Huertas, 792 F.3d 223, 228 & n.4 (1st Cir.), cert. denied, 136 S. Ct. 258 (2015). Here, however, the claim of error fails regardless of which standard of review obtains. Consequently, we assume — favorably to the appellant — that review is for abuse of discretion.

A claim that a sentence offends the parsimony principle is typically treated, for all practical purposes, as a claim that the challenged sentence is substantively unreasonable. See Dunston, 851 F.3d at 100. The appellant characterizes his claim as such, and we will treat it accordingly.

With respect to a claim that a sentence is substantively unreasonable, the key inquiry is whether the sentencing court has articulated a plausible rationale and reached a defensible result.

See Martin, 520 F.3d at 96.  "There is more than one reasonable sentence in virtually any case, and we will vacate a procedurally correct sentence as substantively unreasonable only if it lies 'outside the expansive boundaries' that surround the 'universe' of reasonable sentences."  United States v. Matos-de-Jesús, ___ F.3d ___, ___ (1st Cir. 2017) [No. 16-1695, slip op. at 10] (quoting Martin, 520 F.3d at 92).  This formulation presents an appellant with an uphill climb, and that climb is even steeper when, as in this case, the challenged sentence is within a properly calculated guideline sentencing range.  See United States v. Clogston, 662 F.3d 588, 592-93 (1st Cir. 2011).

The appellant catalogues a litany of factors that, in his view, justify greater leniency.  As a youth, he endured sexual and physical abuse, which led to homelessness when his mistreatment proved too much.  He has experienced a number of health-related problems, including bipolar disorder, depression, anxiety, chronic back pain, and hepatitis C.  In addition, his family will suffer from his absence: he is a father figure to his three stepchildren (ages nine to twelve at the time of sentencing), and his wife suffers from fibromyalgia.

We do not gainsay that this litany of mitigating factors weighs in favor of leniency.  The district court, though, took pains to note that it gave these factors due weight.  It then mentioned several countervailing considerations and — having

constructed a balance — set forth cogent reasons for nonetheless imposing a mid-range sentence.  For example, the court — which had sentenced the appellant for his original drug-trafficking offenses — expressed concern that his relatively short prison term for his prior drug convictions already had taken the mitigating factors into consideration.  The court was entitled to weigh in the balance the fact that it had given the appellant "a significant break" in his earlier case.  Following that lenient treatment, the appellant had neither turned his life around nor learned to "obey the law."  Moreover, the court worried that the appellant continued to have a "mentality that he [could] get away with something."  The court expressed particular skepticism about the appellant's claim that he did not know that alpha-PHP was illegal.

The short of it is that the district court weighed all of the relevant sentencing factors, see 18 U.S.C. § 3553(a), and wove those factors into a plausible sentencing rationale.  That it did not weigh the factors as the appellant would have liked does not undermine the plausibility of this rationale.  See Clogston, 662 F.3d at 593 ("A sentencing court is under a mandate to consider a myriad of relevant factors, but the weighting of those factors is largely within the court's informed discretion.").

The district court also achieved a defensible result.  On this issue, the fact that the concurrent five-year sentences were within the guideline range is deserving of some weight.  See

Rita v. United States, 551 U.S. 338, 347 (2007); United States v. Rodríguez-Adorno, 852 F.3d 168, 178 (1st Cir. 2017).  To complete the picture, the sentences were "responsive to the nature and circumstances of the offense, the characteristics of the offender, the importance of deterrence, and the need for condign punishment." Matos-de-Jesús, ___ F.3d at ___ [No. 16-1695, slip op. at 11].  So viewed, the sentences were within the universe of reasonable sentences for the offenses of conviction.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, the judgment is


**Affirmed.**