# United States Court of Appeals

## For the First Circuit

No. 17-2019

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT RANG, t/n Robert Joseph Rang,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Lynch, Circuit Judge,
Souter,* Associate Justice,
and Kayatta, Circuit Judge.

Seth Kretzer and Law Offices of Seth Kretzer on brief for appellant.
Anne Paruti, Assistant United States Attorney, and Andrew E. Lelling, United States Attorney, on brief for appellee.

March 26, 2019

    * Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**KAYATTA**, **Circuit Judge**.  In July 2017, a jury convicted Robert Rang under 18 U.S.C. § 2422(b) of attempted coercion and enticement of a minor to engage in sexual activity for which Rang could be charged.  Rang appeals his conviction, arguing that the district court erred by denying in part his motion to suppress statements made during an interrogation.  Rang also challenges the sufficiency of the evidence.  For the following reasons, we affirm his conviction.

**I.**

**A.**

Eight-year-old Minor A[1] met Rang online while playing the multiplayer video game Call of Duty on PlayStation.[2]  Minor A and Rang (who was then approximately twenty-five years old) played together nearly every other day for an extended period of time and communicated orally via headsets with microphones.  Minor A told Rang his age and grade in school.  Rang told Minor A that he lived in Pennsylvania, which was true, and worked at Sony, which was not.  Minor A knew that Rang was an adult.

In March 2014, Rang and Minor A became "friends" on Facebook.  Rang asked for and obtained Minor A's home phone number

---

[1] Between January 1, 2014 and December 29, 2014, the timeframe alleged in the indictment, Minor A turned nine years old.

[2] A PlayStation is a gaming system that can be connected to the internet, allowing users across the world to play with one another.  Headsets allow users to talk to one another, and users can also communicate through typed messages.

and home address.  Rang called Minor A's home phone to talk to him and sent Minor A messages through TextNow, an online messaging application that Rang instructed Minor A to download.  Rang gifted Minor A PlayStation cards, ranging from $20 to $50, that could be used to buy PlayStation games or to purchase items within games. Rang also let Minor A access his "PSN" membership, which allowed Minor A to play certain games for free.  Rang used his fictitious position at Sony to manipulate Minor A, such as by telling Minor A that Sony would block Minor A's PlayStation account access unless Minor A played exclusively with Rang.

When Rang and Minor A played private games together, Rang called Minor A "babe," and on numerous occasions said that he loved Minor A.  Rang also talked to Minor A about masturbation, a term with which Minor A was unfamiliar.  Rang explained masturbation to Minor A and told Minor A to search online for specific videos of men masturbating.  On October 28, 2014, Rang sent the following messages to Minor A[3]:  "Omg I love u so much ur making my dick ao hard"; "Can we masturbate babe im so hard we can do it super fast if not it's okay"; "Ok and its ok i understand u don't want to it's ok not mad i'll do it later by myself i wish i had a few pics of you naked."

On October 30, 2014, Rang wrote:

---

[3] We reproduce verbatim the text of the messages.

- 3 -

> [I] really want to play with u since Friday u wont be home or on and also i might be comming out with in the month of nov-ember to see u i really want to be with u in person i really really really want us to live together that would make me more happy then u will ever know.

Minor A testified that he thought Rang was planning to visit him.

**B.**

On December 29, 2014, upwards of ten law enforcement officers executed a federal search warrant at Rang's Pennsylvania home. Rang's father let the officers into the home, where they found Rang on the second floor and handcuffed him. Michael Connelly, a United States Postal Inspector, and Robert Smith, a Massachusetts State Trooper, led Rang to the third-floor attic for questioning. The interrogation that followed began at 8:41 a.m. and lasted two hours and twenty-two minutes, the audio of which was recorded.[4]

At the beginning of the interrogation, Connelly told Rang that "one of the things that we have to do and we want to make sure that you understand is just make sure you understand your rights." Rang was then given printed Miranda warnings to read. As Rang read the rights, he said, "This is just Miranda rights," and "I know my Miranda rights." The following colloquy then took place between Smith and Rang:

---

[4] The district court found, and the government does not dispute on appeal, that Rang was in custody at the time of the interrogation. Neither party disputed below that the questioning constituted an interrogation.

```
SMITH:    Let me, if you don't mind.  I'll read them
          aloud to you as well, okay?

          . . .

          Cause I want to make sure you've got through
          it thoroughly.  You're able to read these okay
          without eyeglasses?

RANG:     I understand.  I've been arrested before.  I
          kind of know.

SMITH:    All right, but just cause I want to make sure
          you got through this thoroughly, okay?

RANG:     I know--

SMITH:    Before we ask any questions we must understand
          that you understand them, okay?

RANG:     I understand them.
```

Smith nevertheless proceeded to read Rang his Miranda rights, after which Rang confirmed that he understood what had been read to him.  Rang signed and dated an acknowledgment that he had received his rights, that his rights had been read to him, and that he understood his rights.

The interrogating officers then asked Rang to read a Miranda waiver.  Rang read the waiver aloud.  After apparently mispronouncing the word "coercion" in the sentence "[n]o promises or threats have been made to me and no pressure or coercion . . . of any kind has been used against me," Rang explained that it meant that the officers weren't "threatening [him] to get any questions or answers."

Connelly informed Rang that it was a felony under 18 U.S.C. § 1001 to lie to a federal agent.  He also told Rang that "if there's a question that you don't like . . . you can say . . . I want to skip over that.  You know, we'll talk about that later.  No problem.  I've got no problem with that.  I would rather you not answer a question than lie to me about it."

Connelly explained that he would report the results of the interrogation to the U.S. Attorney's Office.  Rang then said to Connelly, "[j]ust want to bring up to you, I just got up so bear with me on this, all right? . . . My mind's not 100% working right now."  Connelly and Rang then had the following exchange:

    CONNELLY: If you don't remember something, I don't know
              is an okay answer.  I don't want you to say--

    RANG:     I don't like those.

    CONNELLY: --I don't know to everything.

    RANG:     I don't know.  I don't like those kind of
              answers.  I'd rather think it out beforehand.

    CONNELLY: And, okay, so that's, we're on the same page.

    RANG:     Yes.

    CONNELLY: And if you have any questions for me, stop me
              and say, you know . . . I don't understand
              what you're asking.

During the course of the interrogation, Rang admitted that he had:   (1) sent Minor A sexually explicit messages; (2) reserved a hotel in Yarmouth, Massachusetts for a weekend in June; (3) instructed Minor A to download TextNow, an online

- 6 -

messaging application; and (4) sent Minor A PlayStation cards as gifts. Rang also admitted to being sexually attracted to minor boys and acknowledged the illegality of child pornography.

Pursuant to the search warrant, law enforcement seized Rang's iPhone, which contained, among other evidence, Minor A's phone numbers and email address and calendar information regarding Rang's hotel reservation for June 2015. Handwritten notes in Rang's bedroom contained Minor A's contact information, Minor A's PlayStation account names, Minor A's email addresses and passwords, and a note stating "Money goal to be saved by June to go see [Minor A]" with a dollar amount of $1,300.

## c.

Rang was indicted on February 26, 2015, for attempted coercion and enticement of a minor in violation of 18 U.S.C. § 2422(b). In due course, Rang filed a motion to suppress statements obtained from him by Connelly and Smith during the interrogation. Before the government responded, the parties executed a plea agreement. See Fed. R. Crim. P. 11(c)(1)(C).

Six weeks later, Rang informed the district court by letter that he wished to withdraw his plea. The district court rejected the plea agreement, holding that it was not entered into knowingly and voluntarily.

After further briefing, the district court held a suppression hearing. The district court granted Rang's motion to

suppress all statements obtained during the interrogation before the officers gave Rang his Miranda rights. United States v. Rang, No. 1:15-CR-10037-IT-1, 2017 WL 74278, at *8 (D. Mass. Jan. 6, 2017). It denied Rang's motion with respect to the statements made after Rang waived his Miranda rights. Id.

The case was tried over a seven-day period. The jury convicted Rang on the sole count of attempted coercion and enticement of a minor. The court sentenced Rang to twelve years' imprisonment and fifteen years' supervised release. This appeal followed.

## II.

### A.

Rang challenges the district court's refusal to suppress his statements made during the interrogation after he received Miranda warnings. We review a district court's findings of fact on a motion to suppress for clear error and afford de novo review to questions of law. See United States v. Coombs, 857 F.3d 439, 445-46 (1st Cir. 2017).

A Miranda waiver must be made knowingly, intelligently, and voluntarily. See United States v. Sweeney, 887 F.3d 529, 536 (1st Cir. 2018). Rang argues that his mental capacity inhibited his ability to waive his rights. Indeed, the district court credited evidence of Rang's "borderline intellectual functioning," including testimony from a licensed and board-certified clinical

- 8 -

neuropsychologist who evaluated Rang's cognitive abilities that Rang "has an impaired ability to understand complex or abstract concepts, to apply logic, and to use sound judgment." Rang, 2017 WL 74278, at *5. The neuropsychologist also testified that "people who interact with [Rang] might not readily be aware of his impairment, due to his strong social skills, average vocabulary level, and ability to follow straightforward directions." Id.

The district court nevertheless denied the motion to suppress to the extent it included any statements made after Rang received Miranda warnings and waived his right not to speak. Id. at *8. It reasoned that Rang had knowingly, intelligently, and voluntarily waived his rights and that Connelly and Smith did not use coercive tactics to overbear Rang's will. Id. at *4-8. We will uphold the district court's decision if "any reasonable view of the evidence supports the decision." United States v. Materas, 483 F.3d 27, 32 (1st Cir. 2007) (quoting United States v. Hawkins, 279 F.3d 83, 85 (1st Cir. 2002)).

The type of diminished mental capacity demonstrated by Rang does not by itself insulate him from a finding that he waived his Miranda rights knowingly, intelligently, and voluntarily. See, e.g., Colorado v. Connelly, 479 U.S. 157, 164 (1986); Coombs, 857 F.3d at 450; United States v. Rojas-Tapia, 446 F.3d 1, 7 (1st Cir. 2006) ("A defendant's mental state or condition, by itself and apart from its relationship to official coercion, is never

- 9 -

dispositive of the inquiry into constitutional voluntariness."). Rather, a court views the totality of the circumstances -- including the defendant's mental capacity -- to decide whether the government has proved, by a preponderance of the evidence, that the defendant's waiver was "both 'voluntary in that [it was] the product of a free and deliberate choice rather than intimidation, coercion and deception' and also made with 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon.'" Sweeney, 887 F.3d at 536 (quoting United States v. Rosario-Díaz, 202 F.3d 54, 69 (1st Cir. 2000)); see also Moran v. Burbine, 475 U.S. 412, 420 (1986).

We find that the district court's denial in part of Rang's suppression motion is supported by a reasonable view of the evidence. Rang knew his rights, even before the officers arrived. See generally Rojas-Tapia, 446 F.3d at 8 ("[W]hatever the deficiencies in his intellectual functioning, [the defendant's] repeated earlier exposure to Miranda warnings made it extremely unlikely that he failed to understand his rights at the time he made these incriminating statements."). The officers repeatedly made clear that he need not speak with them. And Rang's cogent, on-point explanation of the meaning of coercion belies any claim that he could not understand that central concept. A review of the interrogation transcript indicates that Rang was responsive and followed the thread of the questioning -- even crafting lies

- 10 -

when it appeared to help him -- supporting the district court's conclusion that Rang "gave coherent answers which signaled his understanding of the questions asked."  Rang, 2017 WL 74278, at *7; see Coombs, 857 F.3d at 450.

In addition to his statements during the interrogation, Rang's actions evince an ability to comprehend complex concepts and long-term consequences.  For example, Rang's relationship with Minor A was cultivated throughout a series of months, during which Rang displayed a firm understanding of his goal, careful planning, and a nuanced use of carrots, sticks, truths, and lies in pursuit of his desired outcomes.  The district court could reasonably view all of this behavior as contradicting any contention that Rang was unable to weigh the possible ramifications of engaging with the officers.  Nor does the record undermine the conclusion that Rang's cognitive limitations did not preclude him from deciding to speak while knowing that the government could not require him to do so. Cf. Jackson v. McKee, 525 F.3d 430, 436-37 (6th Cir. 2008) (holding that "there is nothing cognitively complex about the advice that one has a right to remain silent and not to talk to the police" (citing Finley v. Rogers, 116 F. App'x 630, 638 (6th Cir. 2004)).

That the subsequent conversation, after Rang's waiver, lasted more than two hours did not in any way retroactively vitiate the waiver itself.  Indeed, in Rosario-Díaz, we held that evidence that a defendant whose "I.Q. was in the middle 70s" and who "had

- 11 -

no prior involvement with the criminal justice system" waived her <u>Miranda</u> rights even when the subsequent interrogation lasted longer than six hours. 202 F.3d at 69.

Rang also argues that Connelly and Smith misled Rang when he asked the officers what would happen after the interrogation. Connelly told Rang:

> The reason why we're here and what's going to happen at the end of the day is I'm going to make a few phone calls to the U.S. Attorney's Office. If we've cleared up you know the matter that we're here at and they say yup, you know we're good, no problems, you'll be let to go, you know, on about your merry way.

Connelly continued:

> On the flipside, if suddenly we find you know three children and three kilos of cocaine in your basement, we're going to have a different . . . you know conversation. . . . [S]o the answer to your question is we don't know what's going to happen right now but I have no reason to believe that, you know, anything crazy's going to go on. If something does change, I'm going to tell you about it.

While literally true, Connelly's response nevertheless conveyed an impression that there was a real chance Rang would be on his "merry way." That impression, though, was tempered by Connelly's subsequent statement that he did not know "what's going to happen." Furthermore, Connelly told Rang that he was being interrogated as part of an ongoing federal investigation that was nearing its end.

Finally, and importantly, the officers never suggested that Rang's words could not be used against him in a prosecution.

When reading Rang his rights, Smith explained that just the opposite was the case. That is, Rang had the "right to remain silent" and "[a]nything [Rang said could] be used against [him] in court." And Connelly stressed that "if there[] [was] a question that [Rang didn't] like . . . [Rang could] say, Mike, I want to skip over that. . . . I would much rather you not answer a question than lie to me about it."

Rang also emphasizes the fact that he told the officers that his mind wasn't "100% working right now." But, even taking that statement at face value, it was apparently made in regard to the fact that Rang had "just got[ten] up" -- reasonably interpreted by Connelly to mean that Rang had just woken up, given that the interrogation began at 8:41 a.m. -- not in relation to his long-term cognitive capacity.

Of course, one might reasonably posit that no reasonably intelligent person would waive Miranda rights, especially when guilty. Hence the waiver here must not be "intelligent" in every sense of the word. But very many people -- including intelligent people -- do indeed speak to investigators, even when as a matter of self-interest they are foolish to do so. See generally Mark A. Godsey, Reformulating the Miranda Warnings in Light of Contemporary Law and Understandings, 90 Minn. L. Rev. 781, 792 (2006) ("[M]odern studies demonstrate that roughly eighty percent of suspects waive their Miranda rights and talk to the police.");

Paul G. Cassell & Bret S. Hayman, Police Interrogation in the 1990s: An Empirical Study of the Effects of Miranda, 43 UCLA L. Rev. 839, 842 (1996) (finding that only a "fraction of suspects (about 16%) invoke their Miranda rights"); see also Pettyjohn v. United States, 419 F.2d 651, 654 (D.C. Cir. 1969) ("We are unable to accept the thesis that no one can ever intelligently waive an important constitutional right voluntarily . . . ."). The question is whether Rang possessed the minimum intelligence necessary to understand that speaking to law enforcement was optional. And the record clearly evidences such an understanding. The Constitution guards against compulsion by the state, not poor decision-making by defendants.

Viewing Rang's actions before and during the interrogation, coupled with the precautions taken by the interrogating officers, we affirm the district court's holding that Rang knowingly, intelligently, and voluntarily waived his Miranda rights. See Sweeney, 887 F.3d at 536.

**B.**

Rang additionally argues that the evidence was insufficient to convict him of attempted coercion and enticement of a minor in violation of 18 U.S.C. § 2422(b). We disagree.

The federal statute criminalizing the coercion and enticement of a minor, section 2422(b), provides:

> Whoever, using the mail or any facility or means of interstate or foreign commerce, . . . knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in . . . any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

18 U.S.C. § 2422(b). Under federal law, "attempt" crimes "train our attention on the defendant's 'intention to commit the substantive offense'" and "require[] evidence that the defendant in fact took a 'substantial step towards' the commission of the offense[]." United States v. Saldaña-Rivera, 914 F.3d 721, 725 (1st Cir. 2019) (quoting United States v. Berk, 652 F.3d 132, 140 (1st Cir. 2011)).

Rang argues that his grooming of Minor A evidenced neither an intent to engage in sexual activity with Minor A nor a substantial step towards engaging in such activity. At most, he says "he asked to see [Minor A] masturbate, but never tried to meet him to perform masturbation on Rang." Implicit in Rang's position is the argument that "sexual activity" requires interpersonal physical contact, a question that has caused division amongst the circuits. Compare United States v. Fugit, 703 F.3d 248, 256 (4th Cir. 2012) (interpreting "sexual activity" as conduct connected with the "active pursuit of libidinal gratification" on the part of an individual and therefore not requiring physical contact), with United States v. Taylor, 640

F.3d 255, 259-60 (7th Cir. 2011) (applying the rule of lenity to interpret "sexual activity" as requiring physical contact). We find no need to join this debate, however, as the evidence shows that Rang intended and took steps towards achieving clearly illegal sexual contact with a minor: He rented a hotel room near where Minor A lived and plied Minor A's mother -- who was incarcerated at the time -- with money and assurances to secure her permission for a "sleep over" with Minor A; he told Minor A that Minor A sexually aroused him and that he wanted to masturbate with Minor A; and he asked Minor A to send him naked photographs. Rang further admitted to being sexually attracted to minors, having to "force [himself] away" from thoughts of minors, and spending time with people his age to try to avoid those feelings. On this record, there was ample evidence to allow a jury to conclude that the intended "sleep over" contemplated -- indeed, obsessively envisioned -- interpersonal sexual contact. And by, among other things, reserving a hotel room and pressing Minor A's mother for consent, Rang certainly took concrete steps towards consummating the intended libidinous relationship. Accordingly, we hold that sufficient evidence supported Rang's conviction for attempted coercion and enticement of a minor.

## III.

For the foregoing reasons, we affirm Rang's conviction under 18 U.S.C. § 2422(b).